THOMAS J. NICKERSON *vs.* FREDERIC H. GERRISH.

Cumberland. Opinion January 3, 1916.

*Fracture.      Malpractice.      Physician.      Reasonable Care.*
*Unskillfully Diagnosing.*

Action on the case against a physician for negligently diagnosing and treating the plaintiff's injuries to his right leg as a sprain only, when in fact both bones were fractured. A verdict for $5,000 was returned and the case comes up on motion for a new trial based upon the grounds that the verdict is against the weight of the evidence, and that the damages are excessive.

*Held:*

1. The court is not convinced from an examination of the evidence that the jury's finding as to the defendant's liability is so clearly and unmistakably against the weight of the evidence that it should not be permitted to stand.
2. But the court is constrained to the conclusion, after a study and weighing of all the evidence relating to the damages which the plaintiff is entitled to recover, that the jury manifestly erred in fixing the plaintiff's damages at $5,000. That amount we think is clearly excessive. The opinion of the court is that the evidence does not justify an award of damages in excess of three thousand dollars.

On motion by defendant for new trial. If the plaintiff, within 30 days after the certificate is filed, remits all of the verdict in excess of $3000, motion overruled; otherwise, motion sustained.

This is an action on the case against the defendant, a physician, for negligently and unskillfully diagnosing and treating his right leg as a sprain only, when in fact both bones were fractured. Plea, general issue. The jury returned a verdict for plaintiff for $5000, and the defendant filed a motion for a new trial.

The case is stated in the opinion.

*White & Carter,* for plaintiff.

*Thomas L. Talbot,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, HALEY, HANSON, PHILBROOK, JJ.

KING, J. Action on the case for malpractice against a physician for negligently and unskillfully diagnosing and treating the plaintiff's injuries to his right leg as a sprain only, when in fact both bones were fractured. A verdict for $5000 was returned and the case comes up on motion for a new trial based upon the grounds that the verdict is against the weight of the evidence, and that the damages are excessive.

On January 5, 1914, the plaintiff, who then was and now is superintendent of transportation of the Maine Central Railroad Company, while walking in the round house at Kineo, stepped unawares into an ash pit, so called, about three or four feet deep, striking his full weight on his right foot flat on the brick bottom of the pit, and thereby fractured both bones of his right leg, the fibula and tibia, about three inches above their lower ends. He was immediately placed in the private car of the General Manager of the railroad and taken to Bingham where his leg was examined to some extent in the car by one Dr. Brown who applied a temporary dressing to it until the plaintiff should reach Portland where he lived and receive other surgical and medical treatment. On arriving at his home in Portland, about eight hours after the accident, the plaintiff was attended by the defendant who diagnosed his injuries as a sprain and administered treatment accordingly. Subsequently he visited the plaintiff six times, the last visit being Januay 14th or 15th. At that time the plaintiff was on crutches and suffering considerable pain, but at his suggestion that he wished to get back to his office the defendant advised that he might do so. The defend-

ant did not see the leg again until February 4th, when the plaintiff called at his office, and it was then "obvious to the eye," to use the defendant's words, that there had been a fracture as the result of the accident. The defendant did not, however, inform the plaintiff of that fact, or then propose any treatment to reduce the fractures, but, as he says, advised him to have the leg massaged and report in three days. On the evening of the same day, Wednesday, the plaintiff consulted another physician and an X-ray picture of the leg was taken. The next day the defendant was paid for his services and discharged from the case. On Friday, after a consultation of physicians, the plaintiff went to St. Barnabas Hospital in Portland where, on the following morning, an operation was performed on his leg by cutting down upon the bones, removing the fibrous tissues adhering to the ends of the fractured parts, bringing the scraped ends of the broken bones together in normal alignment as near as possible, and putting the leg in proper splint and dressing. He remained at the hospital two weeks, was then removed to his home and his leg kept in the splint for four weeks more, after which it was put in a plaster cast for six weeks. Since the cast was taken off the leg has been massaged professionally, with daily treatments for about two months and thereafter with two or three treatments a week.

The principles of law applicable to the case are well established and not in dispute. A physician impliedly agrees with his patient that he possesses that reasonable degree of learning and skill in his profession which is ordinarily possessed by other physicians under like conditions, that he will use his best skill and judgment in diagnosing his patient's disease or ailment and in determining the best mode of treatment, and that he will exercise reasonable care and diligence in the treatment of the case. *Patten* v. *Wiggin,* 51 Maine, 594; *Cayford* v. *Wilbur,* 86 Maine, 414; *Ramsdell* v. *Grady,* 97 Maine, 319.

The defendant is admittedly a physician of eminent learning and skill in his profession, and the plaintiff predicates his right to recover in this action on the contention that, notwithstanding the defendant's qualifications, he did not give to his case the exercise of his best knowledge and skill, but carelessly and negligently examined his

leg and thereby failed to discover the fractures which he would have discovered had he exercised reasonable care and diligence.

The defendant, on the other hand, contended that he made a careful and painstaking examination of the leg by manipulating it, by testing for crepitus, for deformity and for any preternatural movements, using his best knowledge, skill and judgment to determine the nature of the plaintiff's injuries and to detect any evidence of fracture, and that he was unable to find any, and that thereafter during his treatment of the plaintiff he discovered nothing indicating to him that his diagnosis was wrong, until his examination of the leg on February 4, when the fact of the fracture was obvious.

The plaintiff not only contended that the defendant did not make a reasonably thorough and careful examination of the leg by manipulation or otherwise, but he also strongly urged that the defendant was remiss and negligent in relying upon an examination by manipulation under the circumstances, and that he should have had an X-ray picture of the leg taken as suggested to him, and which all admit would have disclosed the fractures. And upon this point there was testimony introduced by and in behalf of the plaintiff from which the jury could well have found that the defendant was informed at the outset that Dr Brown had not been able to determine with certainty whether the injury was a fracture or sprain, and had proposed that an X-ray picture of the leg be taken, and that the advisability of using the X-ray for safety was suggested to the defendant both before the plaintiff was taken from the carriage into his house on the day of the accident, and while he was making his first examination, and that he declined the suggestion with the statement that he could readily tell if the bones were broken by manipulation. The plaintiff also testified that two or three days after the accident he asked the defendant if there was any possibility of any trouble with the bones, and if he thought an X-ray ought to be taken, to which he replied in the negative. This the defendant did not really contradict, but testified that while he did not recall if the plaintiff made that inquiry of him, yet if he did he gave a negative reply as to the advisability of it.

There was considerable testimony of physicians, on the one side and the other, as to the difficulty of diagnosing injuries to the lower leg or ankle, and as to the methods of examination for such injuries,

and the relative utility of the different recognized tests that are used to detect fractures in the lower leg or ankle. While that testimony was not altogether in harmony, it disclosed a concensus of opinion that there are certain recognized methods of examination or tests to be used when the nature of such injuries is not obvious, but hidden and difficult of diagnosis. And all agree, that an X-ray picture of the injured parts will disclose with almost absolute certainty whether any fracture exists, that the next most useful mode of examination or test to detect a fracture is manipulation and moving of the injured parts while the patient is etherized, and that manipulation without etherization is the least efficient method, because it is necessarily more or less limited on account of the pain thereby caused to the patient.

That the defendant was perfectly familiar with all the methods and tests recognized by the profession to be used in such examinations, and understood their relative usefulness, is conceded. He concluded that it was unnecessary in the plaintiff's case to have an X-ray picture taken of the leg, or to etherize the patient, and he relied upon his manipulation of the injured parts and his examination for deformity or other possible indication of fracture, as affording him sufficient information upon which to base his diagnosis. He made a mistake, however, and his diagnosis was wrong. But that fact alone is not sufficient to render him liable. Something else must be shown. And the issue before the jury in this case necessarily was, whether that mistake was the result of a failure of the defendant to use painstaking care and diligence, and to exercise the best of his admitted learning, skill and judgment in his examination and treatment of the plaintiff's injuries. That issue the jury found in the plaintiff's favor. It will serve no advantage to undertake to analyze here all the evidence presented bearing on that issue. We have studied it with care, and are not convinced by it that the jury's finding as to the defendant's liability is so clearly and unmistakably against the weight of the evidence that it should not be permitted to stand.

But the court is of opinion that the amount of damages awarded by the jury is excessive.

The plaintiff is entitled to such damages as resulted to him from the defendant's failure to correctly diagnose the nature of his injuries and treat them accordingly. Those damages should be com-

pensatory to the plaintiff, so far as possible, for his increased pain
and suffering, his additional loss of time, his reasonable and neces-
sary expenses incurred, and for any increased physical impairment
shown to have been caused by the defendant's negligence.

In determining to what extent the plaintiff suffered increased
pain and additional discomfort and inconvenience on account of
the delay in reducing and treating the fractures, the fact should not
be lost sight of that if the fractures had been discovered at the out-
set and properly treated the plaintiff would have been subjected to
pain and suffering, and been put to the inconvenience incident to
the prolonged and uncomfortable treatment necessary to be adopted
for the cure of such injuries. And the evidence shows that an ordi-
nary uncomplicated fracture requires from six to ten weeks to make
a good bony union. Undoubtedly the plaintiff's pain and discomfort
were increased and prolonged somewhat as the result of the defend-
ant's negligence, and for that, whatever it was, full compensatory
damages should be awarded.

As to the plaintiff's damages for loss of time, the evidence shows
that his annual salary at the time of the accident was $2700, that
he remained away from his office and employment some six or eight
weeks, but receiving his salary just the same, and that he is now
holding the same position with the same compensation as before.

The evidence shows that at the time of the trial the plaintiff was
still suffering some inconvenience in the use of his foot. Dr.
Abbott, the surgeon who performed the operation on the leg and
treated it thereafter, testifying in direct examination as to the con-
dition of the leg when the cast was taken off, about eight weeks
after the operation, stated that the bony union was "very good
indeed" and that so far as the union of the bones was concerned the
leg was practically as good as ever. He examined the leg and foot
a few days before the trial and found that its condition "was very
good," that there had been "a gradual improvement," but that there
was not full motion to the ankle, and he expressed as his opinion
"that there will always be some restriction at the ankle joint." As
indicating the extent of that restriction we quote the following from
the direct examiation of the witness:

"Q. Would it be possible for him to hurry, to run with his foot?
A. I think he could. Q. Would it cause him great pain to do so?

A. I don't think the pain would come from running. He would tire out in a long continued use from it and it would become painful in standing upon it for a length of time. Q. Providing his business called upon him to be on his feet, walking around all day long, what have you to say about his condition? Would he be able to do it? A. He might be able to do it, but I think it would be somewhat inconvenient for him." The gist of Dr. Abbott's testimony as to the permanency of the plaintiff's injuries appears to be that there is now some restriction at the ankle joint caused partly by a shortening of the heel cord, which can be lengthened by an operation, and that such restriction is likely to continue to some extent at least.

Dr. Seth C. Gordon, called by the plaintiff, expressed it as his opinion that the function of the plaintiff's ankle joint will never be as good as it was before the injury, and that "he will never get an absolutely healthy normal foot," which result, in his judgment, is due "very much" to the delay in reducing the fractures, but he could not say how much. The evidence does not disclose that there is any material shortening or deformity of the leg, and, as already mentioned, the bony union of the fractured parts was complete.

A finding that the plaintiff had at the time of the trial an impairment of motion in his ankle joint, which may continue and cause him inconvenience, is undoubtedly justified; but we do not think the evidence shows the extent of that impairment, and the inconvenience that may result from it, to be such as to authorize extraordinarily large damages therefor.

It will serve no useful purpose to make further comment here on the evidence in detail relating to the matter of damages. It is sufficient to say, that after a careful consideration of the elements of the damages which the plaintiff is entitled to recover, and a study and weighing of all the evidence relating thereto, the court is constrained to the conclusion that the jury manifestly erred in fixing the plaintiff's damages at $5000. That amount we think is clearly excessive. And the opinion of the court is that the evidence does not justify an award of damages in excess of three thousand dollars.

> *If the plaintiff, within 30 days after the certificate is filed, remits all of the verdict in excess of $3000, motion overruled, otherwise motion sustained.*