Genevieve DOWNER, Executrix of the last
will and testament of Christie Lajoie

v.

Dr. Lucien VEILLEUX.

Supreme Judicial Court of Maine.

July 2, 1974.

Daviau & Daviau by Jerome G. Daviau, Robert J. Daviau, Waterville, for plaintiff.

Robert W. O'Connor, Augusta, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

DUFRESNE, Chief Justice.

Christie Lajoie appealed from a decision of the trial Court granting the defendant's motion for a directed verdict in a medical malpractice case. She recently died prior to the determination of her appeal and the representative of her estate has been substituted as party plaintiff pursuant to Rule 25(a), M.R.C.P.[1] The term "plaintiff", however, will be used throughout this opinion as referring to Christie Lajoie, the plaintiff below and the original appellant to this Court. We deny the appeal.

The plaintiff was involved in an automobile accident on October 24, 1963. She sustained numerous and serious injuries. She was admitted to the hospital in a condition of shock and close to death. Her injuries included a fracture of the left knee, a compound comminuted fracture of the distal portion of the right femur extending into the joint of the knee and across the kneecap, an impacted fracture

1. See, 18 M.R.S.A. § 2502; Field, McKusick and Wroth, Maine Civil Practice. 2d Ed. Commentary § 25.1 at page 407.

of the right femoral neck, fractures of the skull, and multiple contusions and abrasions. The plaintiff's only complaint in the instant action is confined to the fracture of the right femoral neck which failed to heal properly, resulting in a permanent partial disability.

The defendant, Dr. Veilleux, is a general surgeon and he ministered to the plaintiff upon her admission to the hospital. In his testimony, he elaborated on the plaintiff's injuries and related the order in which he attended to them. He first treated the plaintiff for shock, since this was an immediate "life-threatening" condition. The next item of priority was to treat the distal fracture of the right femur. The bone was badly shattered and "the knee joint was wide open." The kneecap was obviously fractured and there was visible muscle exposed in the open joint. In addition to the obvious and primary danger of infection with such a fracture, the defendant testified that, if the knee joint were to be left open for "more than a day or so," the cartilage would be destroyed, resulting in a chronically stiff and useless knee. Accordingly, when the plaintiff's condition stabilized somewhat on the following day, the defendant surgically reduced the fracture to the distal portion, inserted a pin below the knee, and applied traction. The knee eventually healed properly and the plaintiff does not contend that the defendant's treatment in this regard was in any way unsatisfactory.

For several reasons, the defendant elected not to attempt to reduce the fracture of the right femoral neck. X–Rays of the hip indicated that the broken bones were properly aligned and well impacted at the fracture site. Furthermore, the defendant testified that any manipulation of the bones at the upper end of the femur would have disturbed the fracture at the distal end.

The defendant's testimony that the fracture to the distal portion made it mechanically almost impossible to do anything with the fracture of the femoral neck was supported by the testimony of the only orthopedic specialist who testified, Dr. Stinchfield. The latter also concurred in the defendant's testimony that, with an impacted intracapsular fracture of the femoral neck such as plaintiff's, healing often results even without reduction of the fracture.

In the instant case, however, healing did not result and the plaintiff claims that this failure is attributable to the defendant's negligence. Specifically, the plaintiff contends that the defendant was negligent in failing to reduce the fracture and in applying traction rather than another form of treatment, such as nailing the fractured femoral neck and applying a cast to immobilize the fracture site. Additionally, the plaintiff argues that the defendant was negligent in failing to consult with an orthopedic specialist, in failing to advise her of the fact that the fracture had not been reduced and of alternative courses of treatment, and in allowing premature exercises and weight-bearing.

## THE DIRECTED VERDICT

In considering whether the evidence would have been sufficient to sustain any of the plaintiff's tendered issues for jury consideration, we view the evidence in the light most favorable to the plaintiff, but we must bear in mind that the burden is upon the plaintiff to prove both the negligence of the defendant and proximate causation between the defendant's negligent conduct and the plaintiff's injuries, and, in cases such as this, that expert testimony is essential if that burden is to be met. Cyr v. Giesen, 1954, 150 Me. 248, 108 A.2d 316 (Trans-cervical fracture of femur).

In *Cyr*, we recognized an exception to the general rule under circumstances where the negligence and harmful results are so glaringly apparent as to lie within the common knowledge of laymen. But, as stated in *Cyr*, this case

"concerns such technical and involved medical procedure that it rules out any

possibility of understanding on the part of a layman as to its medical nature and it is therefore self evident that this is not a case falling within the exception of the general rule relating to expert medical testimony in malpractice cases."

The medical aspect of this case was developed through the testimony of the medical witnesses consisting of Doctor England, an internist and neurologist, the defendant, Doctor Veilleux, both of whom were called by the plaintiff, and Doctor Stinchfield, who testified for the defense.

Dr. England's testimony was obviously presented for the purpose of proving plaintiff's claims in her complaint that Dr. Veilleux was negligent in his treatment of the impacted fracture of the right femoral neck, in his failure to bring in an orthopedic specialist for the purpose of repairing and treating said fracture, and in his failure to inform the plaintiff respecting several alleged courses of treatment available and obtaining her consent for the particular treatment chosen.

His testimony may be summarized as follows: He could not say what a physician should do first in treating a patient in plaintiff's condition, because the patient had more than one fracture. A fracture should be reduced, but this is not necessarily true in all cases. He could not say that the plaintiff's hip fracture should have been reduced upon her admission to the hospital. As far as the witness knew, this may not have been possible in view of the plaintiff's other complications.

When asked whether union of the broken bones could be expected from a four-to-six-months period of traction, he answered that this would depend on "the situation of the fragments." He did not elaborate on what was meant by this phrase. He further testified that some fractures have been completely healed by traction alone.

According to the witness, the plaintiff's symptoms indicated a need for reduction of the fracture, but he could not say whether traction alone would have been sufficient to effect that reduction. The failure to reduce could have been one of the causes for the ultimate non-union. Had it been possible, he would like to have seen the fracture "pinned." A pin would have provided more stable immobilization, if it could have been satisfactorily placed. However, the several complications which the patient originally experienced rendered pinning impossible at that time.

Dr. England did not know whether pinning the fracture could have been accomplished at any subsequent time, although he would like to have had it done "as soon as possible."

The witness was asked whether a failure to "take care of the hip" would be detrimental to the patient's health. He answered that this was a matter for the judgment of the doctor in charge. He personally did not know how he would have felt about it.

He further testified that the patient in this case did in fact experience a "poor result." However, he was not sure of the reason for this result. He testified that the presence of the fracture line in an x-ray dated January 31, 1964 would indicate that the fracture had not yet healed. He could not say that the fracture could have been pinned at that time although he "would think" that it would have been timely.

A spica cast would have given more secure immobilization than traction, but the witness could not say whether it was good or bad practice simply to use traction here in view of the patient's other complications. The witness answered unresponsively when asked for his opinion as to whether the actual treatment administered was "adequate." The method employed (traction) was not necessarily bad; in fact, he testified, traction might have handled both fractures very well. One of the reasons why traction is not always effective is that the alternating muscle contractions would have some tendency to vary the

traction on the fracture line. Given the same conditions of healing, all fractures would have healed at their "usual rate;" there was *some* reason why the fractured femoral neck did not heal. One of the reasons for non-union of fractures may be improper reduction. Another possible cause could be premature weight-bearing. Dr. England did not testify that these were the exclusive or even probable causes of non-union in general or with respect to this patient.

Dr. England did testify that it was "bad practice" not to have consulted an orthopedic specialist. He would have expected "better handling" of the patient's hip. The only explanation given for the phrase "better handling" was that an orthopedic specialist might have been able to give more direct attention to the fractured hip.

Finally, Dr. England testified that he would say it was "bad practice" to proceed with the treatment without advising the patient as to the differences between traction, pinning, and a spica cast. He would also say that it was "bad practice" not to tell the patient that the hip fracture had not been reduced. He would like to have the patient know her condition "as far as possible."

Without attempting an extended summary of the defendant's evidence, it will suffice to say that both he and Dr. Stinchfield indicated that there was nothing in the defendant's treatment of the plaintiff which evidenced a departure from standard medical practice. As already noted, both doctors testified that the distal fracture rendered reduction of the intracapsular fracture impossible. Neither doctor stated that there was any need for an orthopedic specialist; in fact, Dr. Stinchfield, who was himself an orthopedic specialist, testified that under the circumstances the defendant's treatment was the proper procedure. Neither doctor indicated that any weight-bearing allowed or ordered by the defendant was "premature" or that such weight-bearing, even if premature, proximately resulted in non-union of the fracture.

Concerning the application of a cast and reduction of the fracture by pinning, both doctors stated that while pinning would be the "ideal" treatment, it was not a feasible alternative in this case. Doctor Stinchfield testified that the cast was merely another way of treating the patient which would have afforded her a little more mobility. He testified that it was not the type of treatment which would have been indicated at first.

"The measure of a physician's legal responsibility has been stated many times by this court. He contracts with his patient that he has the ordinary skill of members of his profession in like situation, that he will exercise ordinary or reasonable care and diligence in his treatment of the case, and that he will use his best judgment in the application of his skill to the case. [citations omitted] The physician is not an insurer. He does not warrant favorable results. If he possesses ordinary skill, uses ordinary care, and applies his best judgment, he is not liable even for mistakes in judgment.

\*   \*   \*   \*   \*   \*

The rule of liability is not a hard one, it is a reasonable one. And the burden is on the plaintiff to show a malpractice." Coombs v. King, 1910, 107 Me. 376, 378, 78 A. 468, 469.

In the above cited case, the plaintiff brought an action against the defendant doctor for negligence in applying x-ray treatments. There was evidence from which the jury could have concluded that the defendant had been inattentive in administering the treatments and there was evidence from medical witnesses that watchfulness on the part of the doctor was necessary in order to avoid the harmful consequences which the plaintiff had in fact experienced. On this evidence the Court held that the record presented a jury question and was sufficient to sustain a verdict for the plaintiff.

In Feeney v. Spalding, 1896, 89 Me. 111, 35 A. 1027, the defendant physician and

oculist performed an operation on the plaintiff's eye. Evidence was presented at trial to the effect that, after the operation, the sight of the eye operated upon was entirely gone, whereas prior to the operation it had been in "at least fairly good condition." The plaintiff contended that the reason for the malfunction was the defendant's negligence in performing the operation. The only medical evidence introduced indicated that the defendant's services were performed in a careful manner and evidenced no lack of due care on his part. On such a record the Court concluded that the evidence was insufficient to sustain a jury verdict for the plaintiff.

■ A poor result, standing alone, is insufficient to establish liability. As the Court observed in Feeney v. Spalding, supra, the plaintiff must prove that the poor result was caused either by the defendant's lack of that degree of skill and knowledge ordinarily possessed by physicians in his branch of medicine, or, by his failure to exercise his best judgment in the application of that skill, or, by his failure to use ordinary care in performing the operation or in administering the treatment involved.

This burden was met in Josselyn v. Dearborn, 1948, 143 Me. 328, 62 A.2d 174, where an expert responded concerning the treatment of the plaintiff's finger: " 'Well, I feel that most any doctor with a history of the case as you show—infection beginning in the end of the finger—would sooner or later have excised this finger and drained it. When or just where I could not say without examining the finger.' " [2]

Aronson v. Perkins, 1967, Me., 233 A.2d 726 provides another example of a case in which the plaintiff met this burden. In *Aronson* the defendant had treated the plaintiff's fractured radius by applying a cast, but, in so doing, he allowed the plaintiff's fingers to remain in an extended or non-functional position. Expert testimony given by the defendant himself established that the standard practice within the osteopathic community was to apply the cast with the fingers in a functional position in order to avoid stiffness in the hand when the cast is removed. The defendant maintained that his departure from that standard was justified in view of the fact that the patient had a history of a rheumatoid arthritic condition. There was an evidentiary conflict, however, as to whether the patient in fact had such a history. The Court held that the case should have been submitted to the jury since the evidence would be sufficient to show that the defendant was negligent (i. e. his conduct evidenced a departure from the standard of care ordinarily exercised by members of the profession) if the jury were to resolve the conflict concerning the arthritic condition in the plaintiff's favor.

■ In the present action, we can find no evidence in the record which established either the standard of care ordinarily exercised by the average and reasonably competent physician in that branch of medicine of which the defendant was a member, or that the defendant's treatment in any way departed from that recognized standard. Even if the evidence could be construed to suggest that an alternative treatment would have been feasible, a physician does not incur liability merely by electing to pursue one of several recognized courses of treatment. Dunn v. Beck, 1927, 80 Mont. 414, 260 P. 1047. It is incumbent upon the plaintiff to show by expert testimony that the treatment pursued by the defendant was something other than that which the average and reasonably skillful physician would have employed. Hair v. Sorensen, 1933, 215 Iowa 1229, 247 N.W. 651; Neifert v. Hasley, 1907, 149 Mich. 232, 112 N.W. 705.

The standard by which a physician's conduct is to be measured is not simply what any one particular practitioner would have done under the circumstances. Davis

---

2. We express no opinion, however, respecting the propriety of the form of the question put to the expert.

v. Virginian Railway Company, 1960, 361 U.S. 354, 80 S.Ct. 387, 4 L.Ed.2d 366; Mayo v. McClung, 1951, 83 Ga.App. 548, 64 S.E.2d 330; Derr v. Bonney, 1951, 38 Wash.2d 678, 231 P.2d 637.

■ Unless it is made to appear that the custom and practice of one particular doctor conforms to the general custom and practice of those reasonably skilled in the profession, such personal and individualistic method of treatment or operation, without more, cannot establish a reasonable basis for an inference that another doctor who has not followed said method has departed from the general custom and practice in the profession, nor can it support a conclusion of negligent practice on his part. Collins v. Itoh, 1972, Mont., 503 P.2d 36.

In Horton v. Vikers, 1955, 142 Conn. 105, 111 A.2d 675, for example, the plaintiff's expert witness testified in conclusory fashion that some of the defendant's procedures were "bad practice," but the witness never once stated that the defendant failed to use that degree of skill and diligence ordinarily possessed and employed by surgeons in the same line of practice. As the Court there observed: "[I]t was impossible to determine from his use of that phrase whether he meant 'bad practice' as measured by his 'subjective standards or by Bellevue Hospital Standards, or by indefinite and unfixed standards of orthopedic surgery.'" 111 A.2d at 678. Although that case involved a jury-waived decision

in favor of the defendant and not a directed verdict as in our case, the point is equally applicable to the present situation, as the result in both cases is that the plaintiff has failed to establish a necessary element in her burden of proof.

An analysis of Dr. England's testimony in this case demonstrates the reasoning behind the rule. Initially, we observe that Dr. England found no fault with the defendant's actual treatment of the plaintiff. On the contrary, Dr. England's testimony indicates a disapproval of the defendant's *failure* to consult a specialist and of his failure to communicate with the patient more extensively. Setting aside for the moment this latter failure, all that remains in the evidence is the fact that Dr. England personally would have summoned an orthopedic specialist.

## DUTY TO CONSULT A SPECIALIST

Dr. England may have had good reason to consult a specialist, since he was a neurologist and had never treated an intracapsular fracture. The defendant's liability, however, is not dependent upon Doctor England's experience. Unlike Dr. England, the defendant himself has treated many fractures of the hip and femur and nothing in the evidence shows that he lacked the skill or experience required for treatment of plaintiff's injuries, or that an orthopedic specialist would have treated her injuries other than as the defendant treated them. The evidence, in fact, is to the contrary.[3]

3. In this respect, the present case is strikingly similar to our recent decision in Duguay v. Pomerleau, 299 A.2d 914 (Me.1973). In *Duguay*, the plaintiff's expert witness, an "internist-neurologist," testified that it was "bad practice" for the defendant doctor to have treated the plaintiff's fractured elbow without first consulting a specialist. Although we implicitly indicated our opinion that such testimony fails to establish properly the doctor's duty, our decision was based on narrower grounds. Mr. Justice Wernick stated the Court's holding as follows:

"Yet, even if such testimony be held sufficient to warrant a jury's conclusion that the witness had gone beyond expressing a

personal preference and had offered an expert opinion that defendant had violated community standards of treatment, thereby to be negligent, plaintiff's case founders for lack of proof of legal cause. The record is barren of evidence warranting a rational conclusion that the treatment prescribed by defendant would have been found unacceptable and that a different treatment would have been introduced had an orthopedic specialist been consulted. Thus, regardless of whether defendant's omission to consult with a specialist might, in these particular circumstances, be adequate to authorize a jury finding of negligence by the defendant, there is here a total failure of proof of

Collins v. Itoh, supra, although involving injuries different from those sustained by the plaintiff here, addressed many of the arguments advanced in the instant case. Concerning the duty of an attending physician to consult a specialist, the Court there stated: "Certainly no duty to call in another doctor arises when every indication is that the doctor is fully capable of performing the operation and treating his patient in the post-operative phase." 503 P.2d 36, at 42. If we were to hold that the evidence in the present case established a duty on the defendant's part to consult an orthopedic specialist, the effect of our decision would be to say that a physician, even though shown to be competent to treat the illness or injury at hand, subjects himself to liability whenever he relies on his own skills and applies them diligently, but fails to effect a cure. Since there is no evidence in this case that the defendant's failure to consult a specialist proximately caused or aggravated the plaintiff's injuries, such a holding would not only inhibit the practice of medicine to the point where even the simplest procedure would have to be performed in tandem, but also, it would render the self-reliant physician an insurer contrary to what this Court has held the law of Maine to be. See, Coombs v. King, supra.

■ We hold that, apart from the question of informed consent which we shall next discuss, the evidence was insufficient to generate a jury issue as to the defendant's negligence, because the plaintiff failed to introduce expert testimony to show the standard of care required of the defendant, any departure from that standard, and any proximate causal relationship between such a departure, if any, and the plaintiff's injuries. Nor was any showing made of any duty and consequential failure to consult a specialist.

### INFORMED CONSENT

Although the plaintiff admits giving a general consent to treatment, it is alleged in her brief that "Defendant treated her hip or failed to treat it at all without her informed consent. . . . . all of which constitutes negligence and a technical battery upon her body." Although the evidence is conflicting as to the extent of disclosures made by the defendant to the plaintiff, the jury could have concluded that the defendant failed to inform the plaintiff that the fracture had not been reduced and failed to discuss with her the distinctions between the various methods of treating broken bones.

■ Notwithstanding the plaintiff's phrasing of her theory of recovery, we do not believe that the defendant's liability, if any, should be premised on a battery concept, technical or otherwise. True, some jurisdictions are inclined to approach such cases from that point of view. See, Cooper v. Roberts, 1971, 220 Pa.Super. 260, 286 A.2d 647. But, the "majority trend" is towards treating the physician's failure to disclose as merely another variety of medical negligence, reserving the battery theory for cases in which the treatment is either against the patient's will or substantially at variance with the consent given. See, Cobbs v. Grant, 1972, 8 Cal.3d 229, 240, 104 Cal.Rptr. 505, 512, 502 P.2d 1, 7; Wilkinson v. Vesey, 1972, R.I., 295 A.2d 676; Collins v. Itoh, supra; ZeBarth v. Swedish Hospital Medical Center, 1972, 81 Wash.2d 12, 499 P.2d 1; Trogun v. Fruchtman, 1973, 58 Wis.2d 569, 207 N.W.2d 297.

As the Wisconsin Supreme Court recently observed:

"Several reasons exist for the inadequacy of the assault and battery theory of liability in situations such as the instant case where the alleged misconduct on the part of the physician amounts to a failure to disclose the ramifications of a pending course of treatment, therapy, or surgery rather than the removal of an organ other than that consented to. First, the act complained of in these cases simply does not fit comfortably within

the second indispensible factor—that the negligence was the legal cause of the injury

and damages of which plaintiff complains." 299 A.2d at 917–918.

the traditional concepts of battery—the intent to unlawfully touch the person of another. In cases such as the instant one, physicians are invariably acting in good faith and for the benefit of the patient. While the result may not be that desired, the act complained of is surely not of an antisocial nature usually associated with the tort of assault and battery or battery. While the unauthorized removal of an organ yet fits the concept of battery, the failure to adequately advise of potential negative ramifications of a treatment does not. Second, and related to the first, the failure to inform a patient is probably not, in the usual case, an intentional act and hence not within the traditional concept of intentional torts. Third, the act complained of in informed consent cases is not within the traditional idea of 'contact' or 'touching.' In the typical situation, as here, the physician impeccably performs the surgery or other treatment. Complained of are the personal reactions to such treatment which are unanticipated by the patient. Thus, for example, the instant drug therapy is not alleged to be an unpermitted touching but rather, the plaintiff alleges he ought to have been advised of the possibility of hepatitis which occurs without fault on anyone's part. Fourth, a valid question exists with respect to whether a physician's malpractice insurance covers liability for an arguably 'criminal' act—battery. If not, it may be asked why a physician should be required to pay out of his own pocket for what is essentially an act of negligence—failing to inform a patient of the risks indigenous to the treatment? Fifth, these essentially negligence cases do not fit the traditional mold of situations wherein punitive damages can be awarded. For these reasons, we conclude it is preferable to affirmatively recognize a legal duty, bottomed upon a negligence theory of liability, in cases wherein it is alleged the patient-plaintiff was not informed adequately of the ramifications of a course of treat-

ment." Trogun v. Fruchtman, supra, 207 N.W.2d at 312–313. (Footnotes omitted).

In the present case, we perceive even additional reasons for declining to follow the battery approach. The plaintiff's original complaint alleged in essence a breach of the defendant's contractual obligations; her amended complaint phrased the action strictly in terms of negligence; her pretrial memorandum, which was subsequently incorporated in the pre-trial order, Rule 16, M.R.C.P., stated that the issues to be tried were "*negligence* of the doctor and causation." (Emphasis added). The plaintiff does not contend that the treatment was administered against her will. The concept of a "technical battery" implies a touching; but the plaintiff does not argue that, in treating her, the defendant committed even a "technical battery," except in so far as her hip is concerned. However, the whole theory of the plaintiff's case (and the only conclusion to be drawn from the evidence) is that the defendant did nothing to the hip. In effect, there was no "touching" of the plaintiff, except to the extent to which she consented.

The plaintiff's allegations and the evidence in this case, therefore, must be analyzed within the traditional concepts of the law of negligence. The first element of the plaintiff's burden is to show that the defendant had a duty to disclose the information withheld.

A doctrine of "implied consent" has been resorted to by the courts with increasing frequency in support of a theory of recovery in malpractice cases. The doctrine is based on the general principle of law that a physician has a duty adequately to disclose to his patient the proposed diagnostic, therapeutic or surgical procedure to be undertaken, the material risks involved therein and the alternatives available, if any, so that a patient of ordinary understanding, confronted with these disclosures and faced with a choice of undergoing the proposed treatment, or selecting an alterna-

tive process, or preferring refusal of all medical relief, may, in reaching a decision, intelligently exercise his judgment by balancing the probable risks against the probable benefits. The rationale of this rule lies in the fact that every competent adult has the right to forego treatment, or even cure, if it entails what for him are intolerable consequences or risks, however unwise his sense of values may be to others.

Some courts have held that this duty to disclose to assure an informed consent from the patient is a matter of medical judgment and is limited to those disclosures which a reasonably prudent physician or medical specialist of the medical community with which the defendant is identified should or would know to be essential to enable a patient of ordinary understanding to intelligently decide whether to incur the risk by accepting the proposed treatment or to avoid that risk by foregoing it. Accordingly, in the view of these courts, whether the information should have been given at all and the nature, kind and extent of the disclosure must in most circumstances be established by expert medical testimony of the standards of the medical community to which the physician belongs. And the burden is placed on the patient to produce said proof. See, Collins v. Itoh, supra; ZeBarth v. Swedish Hospital Medical Center, supra.

Other courts, however, have viewed the patient's right of self-determination in relation to any particular therapy to be undertaken in his behalf to require a duty-of-information standard set by law for physicians rather than one which physicians may or may not impose upon themselves. The duty to disclose, these courts reason, arises from criteria apart from medical custom and practice. Since the test for determining whether a particular hazard must be revealed is its materiality to the patient's decision to submit to, or forego, the treatment, all risks that reasonably would tend to affect his decision must be made known to the patient. These courts hold that, to provide a meaningful safeguard of the patient's prerogative of self-determination of the medical procedures to be used in connection with his person, the law must set the standard for adequate disclosure. See, *e.g.* Cobbs v. Grant, supra; Getchell v. Mansfield, 1971, 260 Or. 174, 489 P.2d 953; Cooper v. Roberts, supra; Wilkinson v. Vesey, supra; Trogun v. Fruchtman, supra. See also, Canterbury v. Spence, 1972, 150 U.S.App.D.C. 263, 464 F.2d 772, cert. den., 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518.

In those jurisdictions where this view prevails, it has been held that the doctor's duty is to disclose all known risks that are material to the patient's decision. Given the risks, the jury is competent to decide, without the aid of experts, whether the risks were material and thus should have been disclosed.

Under either theory, two exceptions to the general rule of disclosure have been recognized, 1) when the patient is unconscious or otherwise incapable of consenting, and harm from a failure to treat is imminent and outweighs any ill effect threatened by the proposed treatment, and when the risk-disclosure poses such a threat of detriment to the patient as to become unfeasible or bad for the patient's well-being in the light of sound medical judgment.

As stated in Canterbury v. Spence, supra, 464 F.2d 772, at 789:

"It is recognized that patients occasionally become so ill or emotionally distraught on disclosure as to foreclose a rational decision, or complicate or hinder the treatment, or perhaps even pose psychological damage to the patient. Where that is so, the cases have generally held that the physician is armed with a privilege to keep the information from the patient, and we think it clear that portents of that type may justify the

physician in action he deems medically warranted."

██ Under either theory, nonfulfillment of the physician's obligation to disclose the material risks incidental to a particular treatment, and to reveal available alternatives and the attendant hazards with them, does not per se establish liability to the patient. As in the case of any breach of a legal duty, the plaintiff must, as in malpractice actions generally, prove a proximate causal relationship between the physician's failure to adequately inform and injury to the patient.

██ Proof of proximate cause in such cases requires, initially, a showing that the unrevealed risk which should have been made known has materialized. Absent occurrence of the undisclosed risk, the doctor's omission is legally inconsequential. Funke v. Fieldman, 1973, 212 Kan. 524, 512 P.2d 539, 548–549.

██ Additionally, it must be shown that, had the patient been informed of the risk, he would not have submitted to the surgery or treatment. With respect to this last element of proof, the courts also seem to be divided. Some courts have squarely held that the jury is to apply an objective test in terms of what a prudent person in the patient's position would have decided if suitably informed of the significant perils involved. See, Canterbury v. Spence, supra; Cobbs v. Grant, supra; Funke v. Fieldman, supra.

Language in other cases suggests that the test to be applied is a subjective one, i. e. whether the particular patient would still have consented, reasonably or otherwise. See, e.g. Wilkinson v. Vesey, supra, 295 A.2d 676, at 690; ZeBarth v. Swedish Hospital Medical Center, supra, 499 P.2d 1, at 12.

It is not necessary to the decision in this case for us to resolve these questions on which the courts have split. The decision as to whether the duty to disclose is governed by medical or by legal standards will be made when the facts of a particular case so require. This is also true with respect to the question of whether an objective or subjective test is to be applied in establishing proximate cause.

██ Expert testimony is necessary to show, not only what the inherent risks of a particular treatment were (Wilkinson v. Vesey, 295 A.2d 676, at 688; Trogun v. Fruchtman, supra, 207 N.W.2d 297, at 315), but also, that the alternative courses of treatment were feasible. Getchell v. Mansfield, supra, 489 P.2d 953, at 956.

In the last cited case, the defendant physician joined the separated parts of the plaintiff's shoulder with wires. When the wires subsequently broke, the plaintiff brought an action against the doctor, alleging that he negligently failed to advise the plaintiff of the risks involved in the procedure used and of alternative methods of treatment. At trial the plaintiff offered to prove that, had the risks and alternatives been disclosed, she would have chosen another method of reuniting the separated shoulder. Although other methods were mentioned, the record contained no expert testimony indicating that the breaking of the wires was a risk inherent in the treatment or that other alternatives were feasible under the circumstances. On appeal this deficiency was found fatal, both as to the plaintiff's claim that her case should have been submitted to a jury and as to her argument that the trial judge erred in refusing to allow questions designed to show that the defendant had not disclosed the risks and alternatives, 489 P.2d at 954, 958. In so deciding, the Court observed:

"In the case of a herniated disc, expert testimony is necessary to decide whether traction is a reasonable alternative to surgery. Again, in the present case, expert medical testimony is essen-

tial to enable a court or jury to decide whether using a screw is a feasible alternative to using wires." 489 P.2d at 956.

This language applies with equal force to the case at bar. The defendant was not obliged to discuss with the plaintiff, in the abstract, courses of treatment precluded by her condition. The law does not impose upon a physician the futile obligation of telling the patient what could be done for him, if only his condition were different. The only expert testimony in the record before us indicates that the defendant did all that could be done under the circumstances. Dr. England's testimony was noncommittal at best, and is not to the contrary. From the evidence in the record, the jury would not have been warranted in concluding that there was more than one way to treat the plaintiff's injuries under the circumstances. There was no basis, therefore, upon which the jury could have found the defendant negligent for failing to disclose nonexistent alternatives to the plaintiff.

We have not overlooked the theoretical possibility that, had the plaintiff been informed of the lack of any medically feasible alternative treatment, she might have elected to forego any treatment at all, choosing inevitable death instead. Such an argument, although not raised here, would find no support from the instant record under either a subjective or objective test.

Accordingly, the defendant's motion for a directed verdict was properly granted.[4]

The entry will be

Appeal denied.

WEBBER, J., sat at argument, but retired before this opinion was adopted.

4. In view of our decision on the merits, it is unnecessary to consider the defendant's argument that the plaintiff's complaint is barred by the statute of limitations. 14 M.R.S.A. § 753.