Priscilla E. DUBOIS

v.

UNITED STATES of America

No. CIV.02–CV–184–B–W.

United States District Court, D. Maine.

June 2, 2004.

144

Anthony K. Ferguson, Kenneth J. Albert, III, Fales & Fales, Lewiston, ME, for Priscilla E Dubois, Plaintiff.

David R. Collins, Office of the U.S. Attorney, District of Maine, Portland, ME, James M. Moore, Office of the U.S. Attorney, District of Maine, Bangor, ME, for United States of America, Defendant.

### MEMORANDUM DECISION

WOODCOCK, District Judge.

### I. Introduction

The Plaintiff, Priscilla E. Dubois, widow and personal representative of Herve Dubois, seeks damages from the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, for what she contends was malpractice committed on December 30, 1997 at the Veterans Administration Medical Center, Togus, Maine ("Togus VA" or "Government"). This Court concludes that Mr. Dubois' bowel preparation did not fall below an appropriate standard of medical care and, in any event, did not cause injury to Mr. Dubois.

This Court, therefore, GRANTS judgment in favor of the Government.

### II. Statement of Facts

### A. Background

Herve Dubois was a decorated war hero and a good and brave man. Born on February 19, 1931, Mr. Dubois served this Country honorably in the United States Marine Corps during the Korean conflict. In late November 1950, Mr. Dubois fought in the Battle of the Chosin Reservoir, one of the most brutal and decisive confrontations of the entire war. During the battle, Mr. Dubois saw extremely heavy action as a tank driver. After a landmine disabled his tank, Mr. Dubois was captured by the Chinese and escaped during a mortar attack while the Chinese marched him to prison.

Mr. Dubois was discharged from active service on November 28, 1952 and, on the very next day, married Priscilla. Together they raised four sons: David, Reggie, Donald, and Steve. Mr. Dubois worked the rest of his life in the Lewiston, Maine area. Ostensibly retired in 1995, Mr. Dubois continued working six to eight hours a day in a repair shop and snowmobile business attached to his home.

### B. Medical History

Sometime before spring, 1997, Herve Dubois began to experience urinary problems, including increasing frequency, urgency and nocturia. He underwent medical therapy without relief and surgery was deemed the best alternative. On May 6, 1997, Mr. Dubois was admitted to Togus VA Hospital to undergo a transurethral resection of the prostate (TURP).[1]

---

1. As a matter of male anatomy, urine flows from the bladder through the urethra to the penis. The urethra passes through the prostate, where seminal fluid is supplied during sexual activity. If the prostate becomes enlarged, the channel through which the urine flows can become constricted, causing symptoms like those Mr. Dubois experienced: in-

Dr. Martyn Vickers, a urological surgeon at Togus VA, performed the TURP. It was a successful, "straightforward" transurethral prostatectomy. Mr. Dubois was discharged that day; no legal claims have been made relating to the TURP. Two potentially significant facts were confirmed during Mr. Dubois' brief hospitalization: (1) tests revealed Mr. Dubois had a prostate-specific antigen ("PSA") level of 1.3; and, (2) the pre-operative anesthesia evaluation confirmed that Mr. Dubois was diabetic with a history of elevated glucose controlled by diet.[2]

On October 3, 1997, Mr. Dubois was examined by Dr. Paula Bellin, a fourth-year medical resident working at the Togus VA on a six-month urology rotation under Dr. Vickers' supervision. Dr. Bellin discovered a "very abnormal and firm" prostate. She performed a biopsy and ordered a series of tests. The results indicated Mr. Dubois had prostate cancer:

his PSA level had risen to 5.1 and he had a moderately growing tumor.

After being advised of a number of treatment options, including watchful waiting, surgery, radiation therapy, and hormonal therapy, Mr. Dubois chose to proceed with an operation known as a radical retropubic prostatectomy ("RRP").[3] Dr. Bellin's records reflect the decision:

> After going through all the pros and cons of the different treatment options, the patient and his wife feel very strong that they would like to undergo a radical retropubic prostatectomy. I did explain to them the possible side effects and complications of surgery including impotence and incontinence as well as possible bleeding, infection, and rectal injury.

*Pl.Ex. 1* at 116. Mr. Dubois was scheduled to be admitted for surgery on December 30, 1997.[4]

---

creased urinary frequency and urgency and nocturia. A TURP alleviates the pressure from the prostate on the urethra, thereby freeing urinary flow. Enlargement of the prostate and TURPs are extremely common; a urologist testifying on behalf of the Plaintiff said about 70 percent of men will suffer from obstruction.

2. Mr. Dubois' medical records were admitted as Plaintiff's Exhibit 1, a 1,737 page, four volume collection of material. Although carefully Bate stamped 1 through 1,737, the medical records exhibit were otherwise wholly disorganized, even chaotic. For example, the first page of a December 22, 1997 pre-operative visit is located in Volume I under Bate stamp 00116 and ends mid-sentence; the Court could not locate the second page of that same visit until it reached Volume IV, Bate stamp 01329. Exhibit 1 contains records on everything from a March 27, 1995 consultation for gastroesophageal reflux disease to medical bills for skilled nursing care. The records contain reams of laboratory results, diagnostic readings, and other scientific data, the significance of which was never explained and, from the Court's perspective, is purely hieroglyphic. In exasperation, the Court completely reorganized the medical records

chronologically; however, the utter lack of organization of the medical records as submitted in this case has delayed and frustrated the Court's decision-making process.

3. At trial, Dr. Vickers explained an RRP involves the surgical removal of the prostate and the seminal vesicles.

4. Dr. Vickers testified he performed a pre-surgical clinical examination, during which he confirmed Dr. Bellin's finding of a firm prostate and concluded the prostate was consistent with inflammation and scarring from the TURP. Based on Mr. Dubois' history, his physical examination, the comparatively low PSA test results, and the tumor's moderate growth rate, Dr. Vickers testified the chance the tumor had spread beyond the prostate was less than 10 percent. Dr. Vickers believed Mr. Dubois fell into the subset of men who would respond well to the surgery, since his cancer was contained.

The medical record contains what is likely a portion of Dr. Vickers' examination under Bate stamp numbers 1327–28. However, the two page note is incomplete. The bottom of 1328 reads: "This note continued on next

## C. Bowel Prep

In view of the proximity of the prostate to the bowel and the irreducible risk of perforation, patients are instructed on performing a bowel prep to evacuate fecal matter from the bowel, to minimize the escape of fecal matter into the area of the urethra if the bowel is entered. Bowel prep is commonly accomplished through the combination of a period of clear liquids and either an enema or a supplemental evacuation technique. An enema clears out only the rectum; whereas, a supplemental evacuation technique clears out the entire colon and is referred to as a full-blown or full bowel prep.

In the week preceding his surgery, Mr. Dubois received conflicting instructions regarding his bowel prep. Dr. Bellin testified her "usual practice" is to recommend a clear liquid diet the day before surgery, a bottle of magnesium citrate the day before surgery, and a FLEET's enema the night before surgery. *Transcript* at 209. Dr. Bellin did not document her instructions in the medical record; however, the Togus VA dispensed a bottle of magnesium citrate and an enema solution to Mr. Dubois on December 22, 1997.

Later the same day, Mr. Dubois met with Edith Breen, a nurse in the Togus VA anesthesiology department. Nurse Breen had not received Dr. Bellin's instructions regarding bowel prep and simply confirmed with Mr. Dubois the importance of following his doctor's orders. Nurse Breen gave Mr. Dubois a set of written instructions providing, in part: "Do not eat anything after midnight: 12/29/97." Nurse Breen's testimony conflicted on whether she told Mr. Dubois he could eat the evening before surgery. When deposed, she suggested she likely told him he could have a light meal; during trial, she testified she only reinforced whatever the urologist had told him.[5]

At 3:00 p.m. on the day before surgery, Janet Radsky, head nurse of the Togus VA surgical unit, telephoned the Dubois house to "reinforce the pre-anesthesia instructions that the anesthesiologist wanted to make sure that the patient was reinforced and understood." *Transcript* at 245. Nurse Radsky told either Mr. or Mrs. Dubois that he was to have nothing "by mouth—food or drink—after midnight the night before surgery." Her pre-operative instructions came only from the anesthesia department, not the surgical department.

On December 30, 1997, when Mr. Dubois was admitted to the Togus VA for surgery, Nurse Harry Bonish conducted a pre-operative assessment and specifically asked Mr. Dubois whether he had anything to eat or drink after midnight. Nurse Bonish testified his inquiry was limited to determine whether the patient was "ready pre-anesthetically for surgery"; he did not address any of the pre-operative orders from urology. *Transcript* at 257.

Mrs. Dubois is the only witness available to establish what her husband did for bow-

---

page"; it is not. There is nothing on the face of the note that confirms it is a record of Dr. Vickers' pre-surgical examination. Nevertheless, the Plaintiff never claimed Dr. Vickers did *not* perform the pre-surgical examination. It is a reasonable inference Bate stamp numbers 1327–28 are a portion of that examination.

5. At her deposition, Nurse Breen testified that, although she could not recall, she "wouldn't encourage him to eat really heartily because oftentimes they'll have—just make more of a light meal" up to midnight on December 29, 1997. *Transcript* at 28–29. When asked if she had not earlier testified that she had told Mr. Dubois he could eat up to midnight, she agreed that her deposition testimony "sounds that way and it sounds terrible, and it's not accurate." *Id.* at 30

el prep the day before the surgery. Her memory is imperfect. She recalls he took both the magnesium citrate and the FLEET enema, but there is no evidence in this record when he did so. During trial, Mrs. Dubois testified that her husband had eaten three meals on December 29, 1997 and a snack at 10:00 or 11:00 p.m. that evening. *Transcript* at 268–69. However, at trial she acknowledged that at her deposition, she had testified she could not remember whether he had eaten the day before. *Id.* at 278.

### D. The RRP

Dr. Vickers performed the RRP on December 30, 1997. During surgery, Dr. Vickers found the prostate stuck, "absolutely adherent" to the rectum.[6] In his attempt to lift the prostate, Dr. Vickers entered the rectum, as evidenced by stool in the wound.[7] Dr. Vickers cleaned the area, packed the wound, and called general surgery to alert them their assistance would be necessary to close the rectum and form a diverting colostomy.

Having packed the rectum and placed it out of the way, Dr. Vickers returned to the prostate. In order to excise the prostate, Dr. Vickers was forced to alter his surgical approach, this time coming from the bladder. Dr. Vickers discovered the prostate and the seminal vesicles were encased in cancerous scar tissue and he was forced to make the unusual surgical move of removing the seminal vesicles separately. After he removed the prostate, the seminal vesicles, and the ampulla of the vas, Dr. Vickers formed the bladder neck, and with Dr.

Bossart, a general surgeon, performed a colostomy. Dr. Vickers' discharge summary dated January 28, 1998 explains the decision to perform a colostomy:

> We elected to do the colostomy in spite of the fact that the patient had undergone a preoperative bowel prep for the following reasons: 1) *I felt that the prep was inadequate in that on opening of the rectum, gross stool escaped;* 2) There was significant inflammatory process in the area of the rectum and prostate, and in fact, the prostate had been adherent to the rectum; 3) The patient was on insulin.

*Pl.'s Ex. 1* at 78 (emphasis added).

Mr. Dubois had a difficult time in the immediate post-operative period. He became confused and hallucinatory. He gradually improved, however, and by January 8, 1998, was discharged. Given his "very aggressive prostatic cancer," Dr. Vickers was concerned that "residual tumor in the pelvis" might prevent proper healing of the rectal wall. He raised the possibility Mr. Dubois could develop a recto-cutaneous or recto-urethral fistula and placed him on drug therapy to promote healing. Dr. Vickers was to see Mr. Dubois in a week and to follow him on a weekly basis thereafter. The next medical record the parties have introduced is dated February 24, 1998, when Mr. Dubois returned to the Togus VA for the removal of the colostomy. Unfortunately, Dr. Vickers' concerns were justified: Mr. Dubois had developed a fistula between the rectum and the urethra.[8]

---

**6.** The prostate sits on a plane called Denonvillier's fascia. When the surgeon arrives at the prostate she literally places her fingers under the prostate and lifts it two to three inches off Denonvillier's fascia.

**7.** Although undesirable, entering the bowel is a known risk for RRPs and can occur despite the best surgical technique. The Plaintiff has

not claimed Dr. Vickers erred in entering the bowel.

**8.** A fistula is "a chronic hole that will not heal." *Transcript* at 91. Mr. Dubois had a rectourethral fistula and, as a consequence, fecal matter from the rectum could enter the urethra and urine could enter the rectum. *Id.*

Mr. Dubois' ensuing medical course does not bear repetition. It suffices to say he suffered discomfort and indignity throughout the remainder of his life. Mr. Dubois underwent a number of efforts to diagnose and surgically repair the fistula. Thankfully, a surgical repair at the University of Massachusetts in November 1998 was successful and his colostomy was reversed. Nevertheless, he continued to experience urinary problems for the rest of his life.

Mr. Dubois died on November 14, 2001. The cause of death was respiratory failure secondary to metastic carcinoma of the prostate with a contributory cause of diabetes. The Plaintiff does not claim Mr. Dubois' death is related to his treatment at the Togus VA in December 1997 and January 1998.

### E. The Medical Malpractice Claim

The Plaintiff's malpractice claim centers on whether the Togus VA adequately prepared Mr. Dubois' bowel for surgery. The Plaintiff contends fecal matter escaped from the rectum and contaminated the area outside the bowel, contributing to the development of the fistula. The Plaintiff's argument is buttressed by Dr. Vickers' description in the discharge summary that the "prep was inadequate." The Government responds that Mr. Dubois' bowel prep did not violate any recognized standard of medical care and, if it did, there is no proximate cause between inadequate bowel prep and Mr. Dubois' development of the fistula.

### III. Discussion

### A. Legal Standards

■ The Federal Tort Claims Act provides, "the United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674. The Plaintiff bears the burden to establish the liability of the United States "by showing that a private individual would be liable under state law—Maine law, in this case—for similar conduct in the same circumstances." *Clement v. United States*, 772 F.Supp. 20, 26 (D.Me.1991).

■ To prove a claim of medical malpractice under Maine law, the burden rests on the Plaintiff to establish: (1) the appropriate standard of medical care; (2) the defendant's deviation from that recognized standard; and, (3) that the conduct in violation of that standard was the proximate cause of the plaintiff's injury. *Ouellette v. Mehalic*, 534 A.2d 1331, 1332 (Me.1988); *Cox v. Dela Cruz*, 406 A.2d 620, 622 (Me. 1979); *Caron v. Pratt*, 336 A.2d 856, 860 (Me.1975). Ordinarily, to sustain her burden, the Plaintiff must produce expert testimony. *Cox*, 406 A.2d at 622; *Cyr v. Giesen*, 150 Me. 248, 108 A.2d 316, 318 (1954). There is an exception to this general rule "where the negligence and harmful results are sufficiently obvious as to lie within common knowledge...." *Patten v. Milam*, 480 A.2d 774, 778 (Me.1984); *Cox*, 406 A.2d at 622; *Cyr*, 108 A.2d at 318; *see* Jack H. Simmons, Donald N. Zillman & David D. Gregory, *Maine Tort Law* § 9.06 (2001 ed.). The standard of care applicable to the Defendant's agents is "that degree of skill and knowledge ordinarily possessed by physicians in [the physician's] branch of medicine...." *Clement*, 772 F.Supp. at 26; *Downer v. Veilleux*, 322 A.2d 82, 87 (Me.1974).

---

The consequences are not merely highly unpleasant; they are potentially extremely serious. *Id.*

## B. Adequate Bowel Prep

### 1. Dr. Peter Bretan.

█ Dr. Peter Bretan, the Plaintiff's expert witness, is Chief of the Northern California Transplant Center—Santa Rosa Memorial Hospital in Novato, California, and a Clinical Associate Professor in the Urology Department at the University of California at San Francisco. Dr. Bretan has taken part in between 150 and 200 RRPs, acting as either primary or assisting surgeon.

Dr. Bretan testified that Mr. Dubois presented three unique risk factors, the sum of which made the Togus VA bowel prep inadequate: (1) a prior TURP; (2) diabetes; and, (3) advanced prostate disease. Dr. Bretan testified the TURP could cause abnormal adherence of the prostate to the rectum, thereby increasing the likelihood of rectal injury. His diabetes presented two separate concerns. First, diabetics often have greater difficulty emptying their colons and, therefore, a full blown bowel prep is more essential. Second, if a rectal injury were to occur, Mr. Dubois was more susceptible to fistula formation. Finally, Dr. Bretan characterized Mr. Dubois' condition as an "advanced disease process." In light of these factors, Dr. Bretan testified the Togus VA should have prescribed a full bowel prep. Dr. Bretan argued that the risks presented by failing to prep the entire colon, as opposed to the rectum alone, are exactly the complications Drs. Vickers and Bellin encountered: an abundance of fecal matter entering from the bowel, the need for a colostomy, and the eventual formation of a fistula. Dr. Bretan concluded that had a full blown bowel prep been used, it is unlikely Mr. Dubois would have developed a fistula.

### 2. Dr. William DeWolf.

Dr. William DeWolf, the Government's witness, is Chief of Urology at Beth Israel Deaconess Medical Center, a teaching hospital of Harvard University Medical School, and a professor of surgery at Harvard Medical School. Dr. DeWolf learned to perform RRPs in the late 1980s from Dr. Patrick Walsh, a surgeon at Johns Hopkins, who is recognized as the world's foremost authority on the procedure. Dr. DeWolf estimates he has performed approximately 700 RRPs since learning the procedure from Dr. Walsh.

Dr. DeWolf explained that when Dr. Walsh popularized RRPs in the early 1980s, surgeons initially used the same type of bowel prep a general surgeon would use for preparing the colon for surgery, one Dr. DeWolf described as "rather severe" and similar to that suggested by Dr. Bretan. Over time, surgeons have changed their minds about the need for a full bowel prep and there is now a wide range of medical opinion about the best bowel prep for RRPs.[9]

Dr. DeWolf explained the lack of a uniform standard is based on the individual physician's balance of medical risks: the benefits of a full blown bowel prep weighed against the risks. Dr. DeWolf testified that for many reasons a full blown bowel prep is not entirely benign. First, the bowel contains both useful and harmful bacteria and a full bowel prep washes away both, making the patient more susceptible to certain types of colonic and wound infections. Second, patients with diabetes, such as Mr. Dubois, have enhanced risks from disruption of their restricted diet by a full blown mechanical bowel prep. Third, the advent of more

---

9. Dr. DeWolf noted Beth Israel omitted bowel prep from its recently established RRP proto-col because its surgeons could not agree on a uniform standard.

effective antibiotics has reduced the need to sterilize the bowel. If the bowel is entered, the surgeon can rely on an antibiotic cocktail to fight bacterial content, as Drs. Vickers and Bellin did during Mr. Dubois' RRP. Fourth, older patients are less tolerant of the dehydration caused by a full-blown bowel prep, which may stress the cardiovascular system. Finally, patients tend to recover from surgery more quickly if they have not undergone a full bowel prep. In light of these issues, Dr. DeWolf said the major reason surgeons now instruct their patients to undergo a bowel prep, even a modified one, is not to sterilize the bowel, but to "debulk" it. In essence, there is a difference in medical opinion about the benefits and risks of the range of bowel prep regimens for RRP procedures.

Dr. DeWolf said the range of medically appropriate bowel preps is significantly broader than Dr. Bretan posited. Dr. DeWolf testified some urologic surgeons allow their patients to eat up to midnight the morning of the surgery itself so long as they have nothing to eat after midnight and have an enema before coming to surgery. *Transcript* at 159–60. He noted Dr. Walsh did not recommend clear liquids in the Seventh Edition of *Campbell's Urology*, the authoritative textbook in the field.[10]

Dr. DeWolf also disagreed with Dr. Bretan's opinions about whether Mr. Dubois' underlying risk factors required a full bowel prep. Dr. DeWolf did not think Mr. Dubois' TURP was an enhanced risk factor. He has performed RRPs on several men with prior TURPs and did not change his pre-operative prep recommendations in those instances. Dr. DeWolf testified the person most at risk in an RRP is someone with inflammatory bowel disease, Crohn's disease, or a prior history of fistula development. In sum, Dr. DeWolf did not think Mr. Dubois presented a higher risk than any other patient.[11]

Dr. DeWolf also disputed Dr. Bretan's conclusion that the absence of a full bowel prep contributed to the need for a colostomy and the development of the fistula. In the first place, Dr. DeWolf testified that medical science is unclear as to the cause of fistulas. Responding to Dr. Bretan's opinion that bacterial infection contributed to the development of Mr. Dubois' fistula, Dr. DeWolf noted if the fistula had been caused by infection, there would have been post-surgical signs of infection; yet, there were none. During surgery, Dr. Vickers had cleaned the area and applied a vigorous course of the appropriate antibiotics and by discharge on January 8, 1997, there was no sign of sepsis. Dr. DeWolf pointed to studies of patients who sustained rectal

---

10. The Seventh Edition of *Campbell's Urology* states:

   Surgery is delayed for 6 to 8 weeks after the needle biopsy of the prostate. . . . During this delay, patients may be offered the opportunity to donate 2 to 3 units of autologous blood. Patients should avoid taking aspirin or nonsteroidal anti-inflammatory agents, which interfere with platelet function, while donating blood and immediately before surgery. *The patients have a Fleet enema on the morning of surgery and are admitted to the hospital on that day.*

   Meredith F. Campbell, *et al., Campbell's Urology* (7th ed. 1998) (emphasis added).

11. Dr. DeWolf's ultimate response to the high risk issue is one Dr. Vickers shared. Dr. DeWolf testified doctors provide all patients with maximum preparation; they do not modify preparations to assist some, but not all patients. Dr. Vickers, a veteran himself, made the same point, appropriately using a military analogy: "What you do is, to coin a phrase, you shoot your bullets. You don't save your bullets on these patients. You get one attempt to do the right thing, and so you give them the best you have, and I feel that's what we gave him." *Transcript* at 295.

injuries with no bowel prep at all, but did not develop fistulas. Dr. DeWolf postulated that Mr. Dubois' fistula formation resulted from a lack of vascularity, or blood supply, possibly related to Mr. Dubois' diabetes.[12]

Dr. DeWolf testified his recommendation in 1997 for patients was exactly what Dr. Bellin recommended to Mr. Dubois—a clear liquid diet the day before surgery, magnesium citrate, and an enema the evening before or the morning of surgery— and the Togus VA bowel prep fit the applicable medical standard of care.

### 3. Conclusion: Standard of Medical Care for Pre–Operative Bowel Prep.

The Court accepts Dr. DeWolf's testimony on the applicable medical standard of care regarding pre-operative bowel prep. Dr. Bretan's view that Mr. Dubois' medical history necessitated a full bowel prep fails to credit the medical profession with sufficient discretion to tailor its advice to the individual. This Court cannot conclude Dr. Bretan's opinion represents the only accepted bowel prep at the time of Mr. Dubois' surgery. Instead, competent medical professionals adhered to a range of sufficient bowel preps and both Dr. Bellin's advice and the more lax anesthesiology bowel prep instructions fell within that range. Therefore, the Plaintiff has not established the Government violated the applicable medical standard.

Further, the Plaintiff has not established a violation of the applicable standard she presented—that is, Dr. Bretan's recommendation of a full bowel prep— would have prevented the fistula. Dr. Bretan focused on the invasion of bacteria-laden fecal matter into the area outside the bowel. He thought the bacteria contributed to the development of the fistula. However, the evidence does not show that it is more likely than not fecal bacteria caused Mr. Dubois' fistula. In view of the absence of any sign of infection upon discharge more than a week after surgery, it is equally possible, if not more likely, that anaplastic cells or lack of vascularity caused the fistula. In short, the Plaintiff did not demonstrate the violation of her version of the applicable standard was the proximate cause of Mr. Dubois' injury.

### C. Bowel Prep Instructions

The Court's conclusion ends the matter. However, for the sake of completeness, the Court will address the Plaintiff's claim that miscommunication between the urology and anesthesiology departments at the Togus VA led to Mr. Dubois receiving confusing and conflicting instructions prior to surgery. The evidence confirms that Dr. Bellin's oral instructions conflicted with Nurse Breen's written instructions and, on the afternoon before and the morning of surgery, the Togus VA nurses reinforced the less stringent written instructions.[13]

12. Dr. Vickers offered another explanation for the development of the fistula. He thought the "most likely thing is this fistula was lined by cancer cells." *Transcript* at 301. The cancer had gone beyond the prostate and was "right in (the) area" of the fistula. *Id.* The cells were "anaplastic." *Id.* Dr. Vickers noted the pathology report confirmed the presence not only of cancerous cells, but also that the cells were unusual in that they produced mucin. This characteristic would ordinarily be seen in cells that line the intestinal tract and this type of cellular production would have aided the creation of the fistula. *Id.*

13. The different bowel prep recommendations between anesthesiology and surgery reflect two different perspectives. Anesthesiology is concerned with putting the patient to sleep and it seeks to minimize the risk of aspiration—passing solids into the lungs—by limiting contents in the stomach. Urology's concern is fecal matter in the bowel. In this case, by virtue of the nurses' actions, anesthe-

The record reveals two disturbing matters. First, it is of concern that the nurses at Togus unwittingly countermanded Dr. Bellin's pre-op instructions. Second, the institutional substitution of more lax anesthesiology orders for more rigorous surgical orders occurred because one arm of the Togus VA failed to communicate with the other. This Court does not, however, need to reach the question of whether this miscommunication could constitute a violation of the appropriate standard of care under Maine law.[14],[15]

Despite this miscommunication, the Plaintiff has still failed to sustain her burden of proof on two critical issues. First, the Plaintiff failed to demonstrate that the substituted bowel prep instructions fell below the applicable standard of medical care. This Court has accepted Dr. DeWolf's opinion that even the more lax anesthesiology instructions fell within the accepted range of medical discretion and,

therefore, the miscommunication did not result in substandard care. Second, there is no convincing evidence that the difference between Dr. Bellin's instructions and the nurses' instructions actually caused Mr. Dubois to develop the fistula. Indeed, Dr. Bretan testified Mr. Dubois would have suffered the fistula even if he had followed Dr. Bellin's more rigorous suggested bowel prep. Simply put, the miscommunication did not cause an injury.

### III. Conclusion

Therefore, the Government is not liable to the Plaintiff and judgment is ENTERED for the Government in this matter.

SO ORDERED.

siology concerns took precedence over surgical concerns. Further, the potential for confusion was enhanced by urology's reliance on oral instructions and anesthesiology's use of written instructions. If in doubt, the patient would be more likely to rely on what he can read than what he can remember, particularly since the nurses were reinforcing only the anesthesia instructions.

14. The Plaintiff makes no claim that Dr. Vickers should have instructed Mr. Dubois on bowel prep. This leads the Court to wonder why Dr. Vickers remained center stage in this proceeding. Initially, the Plaintiff alleged Dr. Vickers and Dr. Bellin negligently performed the surgery by lacerating Mr. Dubois' bowel and damaging his urethra. By trial, however, the Plaintiff dropped this allegation, concluding that "rectal perforation is a recognized risk" of an RRP. (*Pl.'s Trial Brief* at 2 (Docket # 17)). In fact, Dr. Bretan testified, "the surgical performance of the RRP by both Drs. Vickers and Bellin was not a breach of the standard of practice." *Transcript* at 115.

The Plaintiff's sole remaining basis is an allegation of "inadequate bowel prep." (*Pl.'s Trial Brief* at 3 (Docket # 17)). Dr. Vickers

did not instruct Mr. Dubois on bowel prep and Plaintiff does not argue he should have. There is no evidence that implicates Dr. Vickers in the content or institutional processing of these instructions. The Court concludes that there is no evidence that implicates any of Dr. Vickers' actions as forming a basis for the imposition of liability against the United States. Dr. Vickers' testimony in this case was illuminating as a fact and expert witness, but in view of Dr. Vickers' long and distinguished medical career, it is unfortunate the parties failed to recognize that his judgment and skill as a urologic surgeon was never a legitimate issue.

15. The Court cannot entirely absolve Mr. Dubois in this matter. Dr. Bellin's instructions were more stringent than Nurse Breen's instructions. Dr. Bellin explained the importance of bowel prep from a surgical viewpoint and Nurse Breen told him if there was a conflict between anesthesia and urology, he should comply with urology. On the other hand, there is no indication Mr. Dubois intentionally failed to comply with Dr. Bellin's instructions. It is more likely he was confused, a confusion reinforced by the later actions of the Togus VA nurses.