ROBERT H. JOSSELYN
*vs.*
GRANT DEARBORN AND JAMES PAYSON

Penobscot.   Opinion, October 26, 1948.

*Frank G. Fellows,*
*Randolph A. Weatherbee,* for plaintiff.

*James E. Mitchell,*
*James M. Gillin,* for Grant Dearborn.
*Michael Pilot,* for James Payson.

SITTING: STURGIS, C. J., THAXTER, MURCHIE, TOMPKINS, JJ. MANSER, A. R. J.

TOMPKINS, J. This is an action against two osteopathic physicians to recover damages for alleged malpractice in the treatment of the middle finger of the left hand of the plaintiff. Each doctor was represented by separate counsel and both pleaded the general issue. Jury verdict against both jointly.

The plaintiff's declaration alleges due care on his part. The first count in the writ alleges that the defendant Payson "Disregarded his said duties and so carelessly, negligently and unskillfully carried out the extraction of blood from the middle finger of the plaintiff's left hand, and so unskillfully, carelessly and negligently conducted himself in that behalf that, through his want of skill and care said finger and hand of the plaintiff became so greatly infected inflamed, injured and diseased as to render amputation necessary, and the said middle finger of the plaintiff's left hand was thereafter amputated." The second count alleges that "Defendant Payson, not regarding his said duty as such physician

and surgeon . . . . . so unskilfully and carelessly and negligently conducted himself in that behalf that by and through want of skill and care the said sickness, malady, disease and injury of the said plaintiff became so greatly increased and aggravated that it rendered amputation of said finger necessary, and said middle finger of the plaintiff's left hand was thereafter amputated." The third count alleges that the defendant, Grant Dearborn, "So unskillfully and negligently conducted himself . . . . . that by and through his want of skill and care said sickness, malady, disease and infection of the plaintiff became so greatly increased and aggravated as to render amputation of said finger necessary, and the said middle finger of the plaintiff's left hand was thereby amputated." The fourth count is against both defendants alleging that "They so unskillfully and negligently conducted themselves in this behalf that by and through their want of skill and care the plaintiff's sickness, malady, disease and infection of and to the plaintiff became so greatly increased and aggravated that it rendered amputation of the said middle finger of the said plaintiff's left hand necessary, and the said middle finger of the said plaintiff's left hand was thereafter amputated."

The defendant Payson comes before this court on a general motion and exception to the refusal of the presiding justice to give seven requested instructions, two only of which, four and seven, are pressed in argument. The defendant Dr. Dearborn comes before this court on a general motion and exceptions to the denial of the presiding justice to direct a verdict in his favor.

It is clear from the testimony that Dr. Payson undertook to diagnose as well as to treat the plaintiff's malady after the trouble allegedly caused by the defendant, Dr. Payson, in negligently making and treating an incision made by him in the middle finger of the plaintiff's left hand. We construe the gravamen to charge Dr. Payson with negligence in the manner in which he made the incision for taking a sample of the plaintiff's blood, and with negligently and

unskillfully diagnosing the plaintiff's ailment, and negligent treatment of the same. The burden of proof is on the plaintiff to establish his case by a preponderance of the evidence. *Coombs* v. *King,* 107 Me. 376; 78 A. 468; Ann. Cas. 1912 C. 1121. The law of negligence requires that a casual connection must be established between the injury or loss suffered and the negligence with which the defendant is charged. *Kierstead* v. *Bryant,* 98 Me. 523; 57 A. 788; *Lesan* v. *Maine Central Railroad Co.,* 77 Me. 85, 87.

The sequence of events leading up to the plaintiff's alleged injury is as follows: the defendant stated that he had a Bachelor of Science degree from the Massachusetts State College, and had studied medicine for four years at the Philadelphia College of Osteopathy and held a Doctor of Osteopathy degree from that institution, and served one year internship at the Bangor Osteopathic Hospital. Shortly after completing the internship he located at Lubec, in the early part of March 1945. He there became acquainted with the plaintiff, who was employed at a pearl essence factory at Lubec. From informal discussion the defendant learned that the plaintiff had suffered from Raynaud's disease some four or five years previously.

On April 28th, to demonstrate the use of a newly purchased microscope and the method of making a blood count, the defendant incised the tip or end of the middle finger on the plaintiff's left hand. The plaintiff testified that when the incision was made in his finger the lancet was taken directly from the box in which it was resting and the incision made, and no dressing was placed on the finger afterwards, and he was given no instructions as to the care of the finger to prevent infection. The defendant however stated that he cleaned the lancet with a 70% alcohol solution and also the finger with a cotton swab saturated with alcohol, and after making the incision said "It is my habit after I do that to just let them hold it for a minute or two," meaning the cotton swab saturated with alcohol, which defendant said was a good practice.

Two days later, April 30th, a soreness developed in the plaintiff's finger at the point where the incision had been made and it felt as though something was in there. Plaintiff returned to the defendant on that day, told him of the soreness and feeling in the finger, and the defendant then made a minute opening at the point where the incision had been made, found nothing, and the plaintiff was told by the defendant to soak the finger in either a hot water or saline solution as hot as he could stand and as often as he could. Plaintiff stated this advice was followed. Thereafter the plaintiff saw the defendant daily for treatment, and on some days two or three times, up to May 4th. On May 5th the defendant left in the afternoon or evening for Bangor and did not see the plaintiff again until some time late in the evening of May 7th. Defendant left no physician in attendance, nor did he leave any information as to how or where he could be reached in case he was needed by the plaintiff. The plaintiff stated that from the moment he first noticed the pain it became more intense daily, even hourly, the finger began to swell and kept getting larger and larger daily. On Sunday, May 6th, the pain moved into the palm of the hand. The pain was so intense he tried to reach the defendant in Bangor without success, so he went to a local physician who refused to treat the case because the plaintiff was under the care of another doctor. Later on that Sunday he saw Dr. Bilodeau in Eastport. Dr. Bilodeau fluoroscoped the finger, and found some swelling in the hand but no evidence of infection or pus. The plaintiff continued the soaking and wet dressing and kept the hand elevated. He stated he followed instructions implicitly. That on May 7th "the finger had swollen to enormous size, the pain was tremendous, almost unbearable; the palm of the hand was equally sore and swollen; the color—the finger was turning black and the palm of the hand was turning black; pains up my left arm to the armpit, which was sore at the time." The plaintiff stayed in bed from Sunday, May 6th until May 11th, except when the pain was so intense he had to walk the floor. There were red streaks up

the arm which started approximately two days after April 30th, and soreness under the left armpit. Dr. Payson stated he saw no red streaks going up the arm, and that he took the patient to the hospital within twelve hours after he discovered the soreness in the armpit.

On the evening of May 10th the plaintiff decided to ask for further care and to be placed where he could get more treatment, because of the tremendous pain he was suffering. It was decided he should be placed in the hands of Dr. Dearborn at the Osteopathic Hospital in Bangor. Dr. Payson on the morning of May 11th carried the patient by automobile to the Osteopathic Hospital in Bangor, arriving there late in the afternoon. At that time the patient was in tremendous pain and he was given a hypodermic to ease the pain. Dr. Payson told the plaintiff he was going to see Dr. Dearborn, who was confined to his house with a cold. Before he left for home on the morning of May 12th he told the plaintiff that Dr. Dearborn would see him the following day. This Dr. Dearborn failed to do because of his illness. It was not until Monday forenoon, on the 14th day of May, that Dr. Dearborn saw the plaintiff. On the evening of May 14th the plaintiff informed Dr. Dearborn that he was going to the Eastern Maine General Hospital on the next day. On the morning of the 15th Dr. Dearborn redressed the finger. The plaintiff immediately thereafter went to the Eastern Maine General Hospital and was there examined by Dr. Samuel S. Silsby, Dr. Skinner and Dr. Woodcock, and was immediately sent to the operating room for an emergency operation. The middle finger of the left hand was amputated.

Dr. Silsby's qualification as an orthopedic surgeon of eighteen years' experience was admitted, and he stated that in his opinion when he saw the finger on the 15th day of May it was beyond saving, and from experience in similar cases it was beyond saving for twenty-four to forty-eight hours before. Dr. Silsby further stated that the middle finger on the left hand was tremendously swollen and dis-

colored, with a blister, which had apparently been taken away, on the side, and a small drain at the base of the finger; that the skin was discolored and it was necrotic, or, in other words it was rotten; that this necrotic condition involved considerable of the soft tissues, and X-rays revealed a moderate amount of the bone was infected. He also stated there was a palmar abcess from which about half a teaspoon of pus was taken, and pus exuded from the whole length of the finger, which might have been there several days. Dr. Silsby further testified that the presence of red streaks and difficulty in the armpit in an advanced case of this kind was indicative of some spreading of systemic infection, infection spreading to the lymph system which goes into the blood stream. Dr. Silsby was asked the following question: "In your judgment did this doctor exercise the degree of care and skill to be expected of a physician under these circumstances and in the locality of Lubec, Maine?" A. "Well, I feel that most any doctor with a history of the case as you show—infection beginning in the end of the finger—would sooner or later have incised this finger and drained it. When or just where I could not say without examining the finger."

Dr. Payson in defense stated that on May first, two days after the incision had been made by him in the plaintiff's finger, he saw nothing unusual about it, and that in the course of a ride that evening the plaintiff described his finger as whitening that afternoon, which Dr. Payson said indicated to him a recurrence of Raynaud's phenomena. On the second day of May the defendant stated there was indication of slight swelling, and the plaintiff described an occasion of tingling and numbness, which the defendant claimed was symptomatic of Raynaud's disease. From these symptoms he stated his conclusion that the plaintiff was having a recurrence of Raynaud's disease and he gave him advice as to what to do and what not to do, which was to keep his hands very warm, use boric acid soaks, and keep the part elevated as much as possible. On the 4th of May

the plaintiff complained of slight numbness and pain, and from this the defendant believed that the patient was suffering from Raynaud's disease, and advised him he had better not work at all, and the patient told him that all he had to do was to be there, and that he would be able to continue the treatments. When the defendant returned from Bangor late in the evening of May 7th and saw the finger the increase in swelling greatly surprised him. The patient was complaining of pain and was much excited. On the evening of May 10th the defendant discovered enlargement of the lymphatic gland under the arm but found no red streaks up the arm. As a result of finding the inflammation of the glands he suspected that the tissue was becoming infected. No penicillin was administered by Dr. Payson as it was not available in Lubec. The defendant had never treated Raynaud's disease. He had seen one case in the clinic while in medical school. He stated it was a rare disease.

It appeared from the defendant's testimony that the circulation is impaired and slowed down in an attack of Raynaud's disease; that infection is more likely to start; that he knew that the plaintiff had suffered from this disease, and that when he made the puncture in the finger infection might possibly enter through the incision; and that he knew there was more danger of infection where the patient was suffering from a circulatory disturbance. The form of treatment prescribed was for almost any infection; that this was also a treatment for Raynaud's disease because of the heat, and also for the prevention of any possible infection, but that it was not to combat infection that was there already. The defendant stated there was no complaint about severe pain in the finger up to May 4th, the day before he left for Bangor; that there was no increase of swelling in the first phalanx; there was swelling on the 4th of May into the second phalanx but no discoloration on that day; that so far as he knew the plaintiff followed the instructions he had been given in regard to the care of the

finger. He was not concerned about the condition of the finger at the time he left for Bangor because the indications were, in his opinion, that the plaintiff was suffering from Raynaud's disease, and that he did not feel it was necessary to remain in Lubec and treat the patient. Though the swelling continued to increase up to May 11th and went down into the second phalanx and the palm of the hand, yet it showed no symptoms of infection, in his opinion. At no time did the defendant make an attempt to incise the finger for drainage. There was nothing there to drain, so the defendant stated. Defendant denied that he ever told the plaintiff or the plaintiff's wife that the patient was suffering from an infected finger, but between May 4th and May 11th he told them the malady was Raynaud's disease. The provisional diagnosis at the hospital on May 11th, when the patient was admitted, was "Strep infection of the left hand." The final diagnosis was the same. The defendant left the patient in the care of the hospital until Dr. Dearborn should appear. Dr. Payson did not see the patient after the morning of May 12th. The history of the case given to the hospital was by the patient himself. Defendant stated that he was located 135 miles from Bangor and he was not able to give certain tests, as he did not have the equipment, although he had the facilities of the Stoddard Laboratory at the Eastern Maine General Hospital where these tests could have been made.

The other defendant, Arthur Grant Dearborn 2nd, testified that he was an osteopathic doctor and had practiced for eleven years. He first learned of the case under consideration on the 11th of May. At that time he was ill in bed and it was not until Monday, May 14, 1945, that he saw the patient. He said that in the course of his study and work he had occasion to diagnose or observe the features of Raynaud's disease, but his experience with the disease had been relatively limited outside of observing treatment, and it was a very rare disease. He described the disease as a circulatory disturbance peculiar to the extremities. When he ex-

amined the finger of the defendant it was swollen both front and back and had red streaks extending up his forearm, which meant inflammation of the lymphatic vessels. The glands under the arm were swollen and in his opinion the patient had an existing Raynaud's disease with secondary infection. To alleviate the condition he decided that the hand should be excised and drained. Under his direction an intern incised the very large blister which then existed. Under his direction the dead skin was excised and removed from the finger. After that penicillin was administered. Due to the improvement which he claimed had been made while the patient was in the hospital it seemed to be better not to amputate at that time, but it might be necessary to eventually remove the finger.

## DR. PAYSON'S CASE

Motion: The principles of law applicable to the case are well established. "A physician impliedly agrees with his patient that he possesses that reasonable degree of learning and skill in his profession which is ordinarily possessed by other physicians under like conditions, that he will use his best skill and judgment in diagnosing his patient's disease or ailment and in determining the best mode of treatment, and that he will exercise reasonable care and diligence in the treatment of the case." *Nickerson* v. *Gerrish,* 114 Me. 354; 96 A. 235, 236. "A physician is not an insurer. He does not warrant favorable results. If he possesses ordinary skill, uses ordinary care, and applies his best judgment, he is not liable for mistakes in judgment. Medical science is not yet and probably never can be an exact certain science. The practitioner cannot be expected to know or be bound to diagnose correctly that which is unknowable, as many of our hidden ailments may be." *Coombs* v. *King,* 107 Me. 378; 78 A. 468; Ann. Cas. 1912C 1121. A physician or surgeon is not liable for want of the highest degree of skill, but for ordinary skill and of coure for want of ordinary care and ordinary judgment. *Cayford* v. *Wilbur,*

86 Me. 414; 29 A. 1117. One who employs a physician is entitled to an ordinarily careful examination by the attending physician. If he is shown to possess the qualifications stated and exercises his best skill and judgment, with care and careful observation of the case, he is not responsible for an honest mistake of the nature of the malady or as to the best mode of treatment, when there was reasonable grounds for doubt or uncertainty. "If the case is such that no physician of ordinary skill would doubt or hesitate and but one course of treatment would, by such professional men be suggested, then any other course of treatment might be indicative of want of ordinary knowledge or skill, or care and attention or exercise of his best judgment, and a physician might be held liable however high his former reputation." *Patten* v. *Wiggin*, 51 Me. 594; 81 Am. Dec. 593. His failure to discover where there was opportunity for examination and the patient's condition permits, the nature of the malady from which the patient was suffering would be held actionable negligence if reasonable attention by a physician of ordinary skill and intelligence would have discovered the nature of the malady. *Lewis* v. *Dwinell*, 84 Me. 497; 24 A. 945. The physician or surgeon is answerable for injury to his patient proximately resulting from his lack of ordinary skill or from the lack of its application, or from neglect or carelessness in the diagnosis and treatment of the case, or failure to exercise his best judgment. *Patten* v. *Wiggin*, *supra*.

The presiding justice gave the following instruction to the jury on the law governing the case: "A physician impliedly agrees with his patient that he possesses that reasonable degree of learning and skill in his profession which is ordinarily possessed by other physicians under like conditions; that he will use his best skill and judgment in diagnosing his patient's disease or ailment and in determining the best mode of treatment, and that he will exercise reasonable care and diligence in the treatment of the case. He does not warrant favorable results. If he possesses

ordinary skill, uses ordinary care and applies his best judgment, he is not liable for mistakes in judgment. Whether a physician was negligent in making a diagnosis, must be determined in the light of conditions existing and facts known at the time thereof."

We are of the opinion from all the evidence, viewed in the light most favorable to the defendant, that the jury could find that the defendant failed to exercise that skill, care and attention which it was his duty as a physician to exercise towards his patient, that he failed to discover the infected condition of the patient's hand, or failed to recognize its seriousness, and failed to give or procure proper treatment as promptly as he should have done and at a time when it should have been given. With the evidence conflicting it was the province of the jury to decide those controversial questions, and this they have done. "Where the evidence is conflicting upon points vital to the results, the conclusion reached by the jury will not be reversed, unless the preponderance against the verdict is such as to amount to a moral certainty that the jury erred." *Cayford* v. *Wilbur* 86 Me. 414; 29 A. 1117, 1118. There is no such preponderance in this case. Motion denied, except as to damages.

## EXCEPTIONS

Exception four is based on the refusal of the presiding justice to give the following instruction: "A failure on the part of the patient to follow all reasonable and proper instructions given, which contributes to the injury claimed to have arisen because of the negligence of the physician, will bar recovery." The rule on this point has been stated by our court as follows: "It is the duty of the patient to follow the reasonable instructions and to submit to the reasonable treatment prescribed by his physician or surgeon. If he fails in his duty and his negligence directly contributes to the injury, he cannot maintain an action for malpractice against his physician or surgeon, who is negligent in treating the case." *Morrill* v. *Odiorne,* 113 Me. 424; 94 A. 753.

The evidence discloses that the plaintiff testified that he followed the instructions, and the defendant admitted that so far as he knew the plaintiff followed instructions. There was some controversial evidence that the plaintiff injured his finger while shovelling coal May 5th. There is no evidence of anything said or done by the plaintiff that led Dr. Payson into error in either the diagnosis or treatment, or had any part directly in the creation of the cause of action relied upon. If the plaintiff was negligent at all, his negligence merely superimposed itself upon that of the defendant, and for the damages which resulted from his own negligence he cannot recover. *DeBois* v. *Decker,* 130 N. Y. Reports, 325; 29 N. E. 313; 14 L. R. A. 429; 27 Am. St. Rep. 529; *Williams* v. *Marini,* 105 Vt. 11; 162 A. 796. "A patient may, while he is under treatment by his own carelessness injure himself, yet he may recover of the physician if he carelessly or unskillfully treats him afterwards, and thus does him a distinct injury. In such cases the plaintiff's fault does not directly contribute to produce the injury sued for." *Hibbard* v. *Thompson,* 109 Mass. 286. The requested instruction was too broad and properly refused.

Exception number seven is based on the refusal of the presiding justice to give the following instruction: "The locality in which a physician or surgeon practices is important in determining the degree of skill and care required of him." The defendant is sought to be charged with the failure to exercise that reasonable degree of care and skill which is ordinarily possessed by physicians and surgeons practicing under like conditions. The presiding justice in his charge instructed the jury that "A physician impliedly agrees with his patient that he possesses that reasonable degree of learning and skill in his profession, which is ordinarily possessed by other physicians under like conditions." The "like conditions" to be considered by the jury under this instruction would include the location of the defendant at Lubec, that he did not have at hand for the treatment of the case, as he testified, certain medicines and equipment

that were available in larger centers of population, where hospital and laboratory facilities are located, that Lubec is approximately 130 miles from Bangor where hospital and laboratory facilities are available, that the malady according to the defendant was a rare disease, and that his previous training and experience with this disease was very limited. The instruction was sufficiently broad to cover the degree of skill and care required of a physician and surgeon practicing in the locality of Lubec.

## Dr. Dearborn's Case

At the conclusion of the evidence Dr. Dearborn, claiming there was not sufficient evidence in the case to warrant its submission to the jury, moved the presiding justice to direct a verdict in his favor. The presiding justice refused, to which ruling and refusal the defendant duly excepted. After jury verdict the defendant Dearborn filed a general motion for a new trial. The motion raised the same question as the exception. The exception is regarded waived. *Symonds* v. *Free Street Corporation,* 135 Me. 501; 200 A. 801; 117 A. L. R. 986. The motion for a new trial only is considered.

The evidence heretofore quoted shows that Dr. Dearborn first saw the plaintiff and commenced to treat him in the morning or at noon on May 14, 1945, and that during the interval from May 11th, when Dr. Payson left the patient in charge of the Osteopathic Hospital until Dr. Dearborn saw him on May 14th, the plaintiff was treated by other doctors who were on the staff of the Osteopathic Hospital, about which treatment Dr. Dearborn was not consulted and for which treatment Dr. Dearborn assumed no responsibility. The defendant Dearborn treated the patient from sometime in the morning of May 14th until sometime in the evening of that day. The following morning, May 15th, the plaintiff went to the Eastern Maine General Hospital. Dr. Silsby stated when he saw the finger on the 15th day of May it was beyond saving, and from experience in similar

cases it was beyond saving from twenty-four to forty-eight hours before.

The evidence covered both the joint and several liability of the defendants. It is evident from the testimony, viewing it in the light most favorable to the plaintiff, that the services rendered by Dr. Dearborn to the plaintiff were after Dr. Payson had severed his connection with the case and had left the patient in the care of the Osteopathic Hospital. Dr. Dearborn's undertaking was a new and independent consensual contract. He acted independently, upon his own initiative and without any direction from Dr. Payson. "Where an injury is caused by two causes concurring and co-operating or acting in conjunction, for one of which the defendant is responsible and not for the other, he cannot escape responsibility. But before both agencies may be held liable therefor the injury must be caused or contributed to by each, as concurring causes, co-operative and contributing to the injury." *Rogers* v. *Canfield et al.*, 272 Mich. 262; 262 N. W. 409; *Gordon* v. *Lee et al;* 133 Me. 361; 178 A. 353; *Rose* v. *Sprague et al.*, (Ky.) 59 S. W. (2nd) 554, 556 and cases there cited. The evidence discloses that the finger was beyond saving for at least twenty-four to forty-eight hours previous to the operation, and it was within this period of time that the services of Dr. Dearborn were rendered. We do not find in the record any testimony tending to prove that Dr. Dearborn in any way contributed to the proximate cause of the injury. Neither do we find in the record any testimony tending to prove that a joint undertaking or co-operative negligence of the defendants contributed to the plaintiff's injury. Motion sustained as to joint and several liability. Verdict set aside as to Dr. Dearborn and new trial granted.

## DAMAGES

The verdict as to the defendant Payson is proper on the question of liability, but the award of damages made by the jury is excessive to such an extent that the court should in-

terfere. A remittitur might be ordered or the facts again submitted to the jury. The court of itself, however, does not feel justified from the record in reviewing the assessment of damages against Dr. Payson, inasmuch as it is a joint verdict. *Plante* v. *Canadian National Railways*, 138 Me. 215; 23 A. (2nd) 814.

A new trial in the case of James Payson is ordered for the assessment of damages only.

The mandate will be on motion of defendant Grant Dearborn,

> *Motion sustained as to both*
> *joint and several liability.*
>
> *Verdict set aside.*
>
> *New trial granted.*

On motion and exceptions of James Payson,

> *Exceptions overruled.*
>
> *Motion sustained as to damages.*
>
> *Verdict set aside.*
>
> *New trial granted for assess-*
> *ment of damages only.*