Barbara JACOBS, et al.

v.

Stanley L. PAINTER, Jr.

Supreme Judicial Court of Maine.

Argued Jan. 6, 1987.
Reargued June 1, 1987.
Decided Aug. 21, 1987.

William R. Stokes (orally), Robert J. Stolt, Lipman & Parks, Augusta, for plaintiff.

James M. Bowie (orally), Hunt, Thompson & Bowie, Portland, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN, SCOLNIK, and CLIFFORD, JJ.

SCOLNIK, Justice.

The defendant, Dr. Stanley Painter, an osteopathic general practitioner, appeals from a judgment entered by the Superior Court (Kennebec County) on a jury verdict finding him negligent in his medical treatment of the plaintiff, Barbara Jacobs, and awarding damages to her and her husband. For the reasons set forth herein, we affirm the judgment in all respects.

Dr. Painter argues that the Superior Court erred in denying his motions for a directed verdict and for judgment notwithstanding the verdict. He also argues that the court erred in denying his motion to enforce the plaintiffs' voluntary dismissal of their action against him and that a new trial should be ordered because the court did not instruct the jury to apportion liability for damages to the plaintiffs between him and Dr. Amalfitano, the surgeon who performed the operation that resulted in the injuries complained of and who settled with the plaintiffs before trial. We address these arguments in turn.

## I.

### The Defendant's Motions for Directed Verdict and Judgment Notwithstanding the Verdict
#### A. Standard of Review

In reviewing the Superior Court's disposition of a motion for either a directed verdict or judgment notwithstanding the verdict, we apply the same standard of review. We must determine, in either instance, "whether the verdict can be sustained by any reasonable view of the evidence, including all justifiable inferences to be drawn therefrom, taken in the light most favorable to the party in whose favor the verdict was rendered." *E.g. Buchanan v. Martin Marietta Corp.*, 494 A.2d 677, 678 (Me.1985); *Cyr v. Michaud*, 454 A.2d 1376, 1379–80 (Me.1983).

## B. Facts

Viewing all of the evidence in the light most favorable to the plaintiffs, the jury would have been warranted in finding the following facts.

On January 15, 1980, Mrs. Jacobs, who at that time was 68 years old and leading a relatively healthy and active life for her age, visited Dr. Painter, her family physician since the mid–1970s, concerning a lump that had appeared on her chest. After examining his patient, Dr. Painter tentatively diagnosed Mrs. Jacobs' condition as a fractured collarbone. That same day, he sent her to the Waterville Osteopathic Hospital to have x-rays taken and to be seen by Dr. Amalfitano, an orthopedic surgeon who had staff privileges at the hospital.

Dr. Amalfitano saw Mrs. Jacobs that day, reviewed the x-rays that had been ordered by Dr. Painter, examined her, and diagnosed her problem as an "anterior sternoclavicular separation" or dislocation of the collarbone from the sternum. Dr. Amalfitano surmised that this was a longstanding injury. Mrs. Jacobs did not complain of pain associated with the lump. Dr. Amalfitano discussed with Mrs. Jacobs the option of correcting the separation through surgical repair. His office note regarding the appointment with Mrs. Jacobs stated that he was performing a "consult for Dr. Painter" and that Mrs. Jacobs was to be returned to the care of Dr. Painter.

On the same day, following the visit from Mrs. Jacobs, Dr. Amalfitano telephoned Dr. Painter to discuss the diagnosis and the possibility of surgery. He also followed up the telephone conversation with a letter dated January 22, 1980, in which he explained, in more detail, his diagnosis that Mrs. Jacobs had a separated collarbone. He stated, "It is probably long-standing, has probably been that way for a long time and she's never noticed it. That would explain why its not painful." He expressed his concern, however, that the lump could be a tumor and therefore recommended that Mrs. Jacobs be hospitalized and subjected to a few tests "before making other considerations." The letter also discussed the option of Mrs. Jacobs undergoing surgery if further x-rays confirmed the separation of her collarbone and if she decided to have surgery. Dr. Amalfitano concluded his letter with the sentence, "Thank you for permitting me to consult."

On January 25, 1980, having not seen or spoken with Dr. Amalfitano since the January 15, 1980 meeting, Mrs. Jacobs returned to Dr. Painter's office. At that time, while she was in his office, Dr. Painter telephoned the Waterville Osteopathic Hospital and arranged for her admission on January 27 for the purpose of having surgery.

Mrs. Jacobs was admitted to the hospital on January 27 with Dr. Painter recorded as treating physician. Mrs. Jacobs' hospital admission card was filled out by Dr. Painter on that day. He noted on the card that Mrs. Jacobs was being admitted "for surgical intervention of a right clavicular head, sternoclavicular joint" and that because of the possibility of malignancy, "we are planning investigation as to possible sources of our lump."

Dr. Amalfitano arrived at the hospital just after Mrs. Jacobs' admission and learned, for the first time, that she had decided to have surgery. He appended a note to the admission card that states, "Had seen her for consultation but had not completed to date, referring to previous note I understand that she is to get a bone scan and other studies done at this time." He also conducted a second examination of Mrs. Jacobs at that time as a "consultation" for Dr. Painter.

On January 29, 1980, after being advised by Dr. Painter that Mrs. Jacobs still wanted to have surgery, Dr. Amalfitano visited Mrs. Jacobs in the hospital to obtain her consent to the operation. He recommended that she choose surgical repair involving the use of pins to attach her collarbone to the sternum. After Dr. Amalfitano explained certain risks involved in that type of surgery, Mrs. Jacobs signed the "Consent to Operation" form.

The following day, January 30, 1980, Dr. Amalfitano operated on Mrs. Jacobs with the assistance of Dr. Painter. The surgical

procedure that was carried out involved affixing Mrs. Jacobs' collarbone to her sternum by inserting what are known as "Steiman pins." Following surgery, she was placed in a plaster cast by Drs. Amalfitano and Painter.

For the duration of Mrs. Jacobs' stay at Waterville Osteopathic Hospital, Dr. Painter was recorded as her treating or attending physician; he never transferred her care to Dr. Amalfitano in writing, which, under the hospital rules, he would have been required to do in order to place her under Dr. Amalfitano's primary care. The "Admission-Summary Sheet" from the hospital, which was completed at the time of her discharge and signed by Dr. Painter as the attending physician, lists "Consultation with Dr. Amalfitano...."

Mrs. Jacobs was scheduled to be discharged from the hospital on February 7, 1980. Prior to her discharge, however, x-rays revealed that portions of the pins had migrated. One had moved into her lung cavity and the other entered her aorta, the large artery leading to her heart. She was discharged from the Waterville Osteopathic Hospital on February 11, 1980 and transferred to the Osteopathic Hospital in Portland. She underwent emergency open heart surgery on February 12, 1980 to remove the pin that had severed her aorta. During that operation, she suffered cardiopulmonary arrest. She underwent surgery again several times for the installation and removal of pacemakers and for the removal of a portion of a second pin that had migrated into her lung cavity. She eventually was placed in the intensive care unit for nearly one month, at which time she required a mechanical respirator for breathing.

As a result of the foregoing, Mrs. Jacobs suffered permanent injuries. She must wear a permanent heart pacemaker. She also suffers from Parkinson's disease, memory loss, and has difficulty speaking.

At trial the jury heard undisputed testimony, from both the plaintiffs' and the defendant's expert witnesses, that the surgery performed on Mrs. Jacobs for the repair of her collarbone separation was in-appropriate; that, in the circumstances of her case, such an operation never should have been performed.

The defendant's expert witness, Dr. Barrett, an orthopedic surgeon, testified that there is a difference between the treatment of a patient as a "referral" from a general practitioner and treatment of a patient in the context of a "consultation" for a general practitioner. He testified that when a general practitioner sends a patient to a specialist, it is important that the general practitioner make clear whether it is a referral or a consultation, and that it would be detrimental to the treatment of the patient if a general practitioner failed to clarify, one way or the other, the role of the specialist. Dr. Barrett also testified that if a general practitioner "refers" a patient to a specialized surgeon, it is not his responsibility to know the pros and cons of surgery, but if he sends his patient to another doctor for a "consultation," he has an obligation to review the recommendations of the consultant and to discuss those recommendations with the patient.

The testimony of the plaintiffs' expert witness, Dr. Garger, an orthopedic surgeon with experience as a general practitioner, was presented to the jury at trial through the admission of pre-trial deposition testimony. Dr. Garger also testified about the distinction between a "referral" and a "consultation." The substance of his testimony on that distinction and the implications it carried for the treatment of patients was similar to that of the defendant's expert.

He testified, in addition, that it was "very much incumbent upon [Dr. Painter] to know what the pros and cons of surgery [were] and in this particular case the particular type of surgery." The fact that the pin could break was something that should have been "well known to him, and apparently wasn't reasonably well known to him." Basing his opinion on the premise that "the patient totally relies on her family physician, particularly when that family physician recommends a specific specialist that she go to," Dr. Garger testified that Dr. Painter deviated from the ordinary

standard of care required of a general practitioner by failing "to discuss [with Mrs. Jacobs] the option of doing nothing ... and by the same token the risk of [undergoing the operation] as opposed to doing nothing." He stated that regardless of Dr. Painter's involvement in the decision that Mrs. Jacobs have surgery, one of Dr. Painter's deviations from an acceptable standard of care "was his failure to explain to the patient what the results would be of having no surgery at all."

Dr. Painter testified that he never discussed the pros and cons of the surgery with either Dr. Amalfitano or Mrs. Jacobs. Mrs. Jacobs was unable to recall at trial whether Dr. Painter advised her about the propriety of undergoing surgery. She did recall that Dr. Painter admitted her to the hospital. When asked why he admitted her she testified, "I was going to have the operation, I guess," but she did not remember which one of the doctors, or if both of them, had told her that she was going to have an operation. Based upon his review of Mrs. Jacobs' medical records, Dr. Garger testified that the decision to operate on Mrs. Jacobs was made prior to the determination that her lump was not a tumor. Dr. Amalfitano testified that when Dr. Painter admitted Mrs. Jacobs to the Waterville Osteopathic Hospital on January 27, 1980, he did so "for the purpose of operating on her shoulder" and at the time of her admission, Dr. Painter "was the physician primarily responsible for her care." Dr. Amalfitano also testified that he did not know how Mrs. Jacobs reached the decision to undergo the operation on her collarbone.

### C. Law

We have, on several occasions, stated that to prevail in a negligence action, the plaintiff must establish that the defendant was under a duty to conform to a certain standard of conduct and that a breach of that duty proximately caused an injury to the plaintiff. *E.g. Rowe v. Bennett,* 514 A.2d 802, 804 (Me.1986); *Macomber v. Dillman,* 505 A.2d 810, 812 (Me.1986).

■ A defendant physician, whether a general practitioner or a specialist, may be held liable for injuries "caused either by the defendant's lack of that degree of skill and knowledge ordinarily possessed by physicians in his branch of medicine, or, by his failure to exercise his best judgment in the application of that skill, or, by his failure to use ordinary care in ... administering the treatment involved." *Downer v. Veilleux,* 322 A.2d 82, 87 (Me.1974); *Josselyn v. Dearborn,* 143 Me. 328, 338, 62 A.2d 174, 180 (1948) (a general practitioner "is answerable for injury to his patient proximately resulting from his lack of ordinary skill or from the lack of its application, or from neglect or carelessness in the diagnosis and treatment of the case, or failure to exercise his best judgment"). Subsumed within these general negligence principles is the more particularized theory that physicians can be held liable for medical malpractice by failing properly to advise or inform a patient about the risks inherent in, or the alternatives available to, a proposed course of treatment. *See Downer v. Veilleux,* 322 A.2d at 89–90; *Woolley v. Henderson,* 418 A.2d 1123, 1128 (Me.1980). To establish a physician's liability under the latter standard, there must exist a causal connection between the plaintiff's injuries and the negligence of the defendant under an "objective test." In other words, the factfinder must conclude that a reasonable person in the position of the plaintiff would not have undergone the proposed treatment had that person been properly informed of the risks or apprised of the available alternatives to the treatment that resulted in injuries. *See id.* at 1132.

In a medical malpractice action premised on the defendant's failure properly to advise the patient or disclose certain information regarding the course of treatment, "[t]he first element of the plaintiff's burden is to show that the defendant had a duty to disclose the information [or advice] withheld." *Downer v. Veilleux,* 322 A.2d at 90.

■ The existence and scope of such a duty is not a matter of law, but is governed by medical standards applicable to "a reasonable medical practitioner" in the defendant's branch of medicine. *Compare id.* at

92 (delaying decision "as to whether the duty to disclose is governed by medical or legal standards") *and Woolley v. Henderson* 418 A.2d at 1129–31 (reaching a decision on the issue left open in *Downer,* and holding that "the scope of a physician's duty to disclose is measured by those communications a reasonable medical practitioner in that branch of medicine would make under the same or similar circumstances").[1] The plaintiff must ordinarily prove the nature and scope of this duty by expert medical evidence. *Woolley v. Henderson,* 418 A.2d at 1131. It is then up to the jury to decide "whether, under the facts of the case, the physician has deviated from the standard of care of the reasonable practitioner." *Id.* at 1130. *See Josselyn v. Dearborn,* 143 Me. at 339, 62 A.2d at 180.[2]

### D. Discussion

Dr. Painter argues that he was entitled to a directed verdict or judgment notwithstanding the verdict because he disassociated himself from the treatment of Mrs. Jacobs' collarbone problem by sending her to Dr. Amalfitano on January 15, 1980. He argues that even viewing the evidence in the light most favorable to the plaintiffs, the jury could not have reasonably found that he was involved in the treatment of that problem after that date. He suggests, instead, that the evidence shows that he referred the treatment of Mrs. Jacobs' dislocated collarbone to Dr. Amalfitano, that Dr. Amalfitano exclusively treated that condition, and that his only medical treatment of Mrs. Jacobs during the time period in question was his care of other aspects of her health unrelated to the dislocated collarbone. As a result, he argues that the jury could not rationally find any duty on his part to advise or disclose information to Mrs. Jacobs about the risks of the proposed surgery or the available alternatives. We disagree.

Undisputed expert medical testimony of both parties established that the existence of Dr. Painter's duty to Mrs. Jacobs in regard to the treatment of her collarbone condition turned on whether or not he sent her to Dr. Amalfitano as a "referral" or whether Dr. Amalfitano served only as a "consultant." This was a factual question for the jury. We conclude that the jury could reasonably have found that from the time Mrs. Jacobs first saw Dr. Painter about the lump on her chest on January 15, 1980, through at least January 28, at which

---

1. As a leading treatise on the law of torts points out, "Under our system of procedure, this question is to be determined in all doubtful cases by the jury, because the public insists that its conduct be judged in part by the man in the street rather than by lawyers, and the jury serves as a shock-absorber to cushion the impact of the law." Prosser & Keeton, *The Law of Torts,* § 37 p. 237 (5th ed.1984).

2. The Superior Court's instructions to the jury in the case at bar were consistent with the legal principles summarized above.

   We note that the court refused to give a jury instruction, requested by Dr. Painter's counsel, that by signing the "Consent to Operation" form given to her by Dr. Amalfitano, Mrs. Jacobs could not claim that her injuries were proximately caused by Dr. Painter's failure to adequately advise her about the risks involved in or the alternatives available to the proposed surgery. Dr. Painter's counsel argued that, pursuant to 24 M.R.S.A. § 2905(2) (Supp.1986), the written consent obtained by Dr. Amalfitano sanitized any prior negligence of Dr. Painter in failing adequately to advise Mrs. Jacobs about the risks of the proposed surgery and the alternatives available. The court rejected that argument on the ground that the information contained in the "Consent to Operation" form did not adequately apprise Mrs. Jacobs of the nature and risks of the surgery. On appeal, the defendant does not challenge the court's refusal to give that requested instruction nor does he suggest that the informed consent statute, 24 M.R.S.A. § 2905, was otherwise improperly applied or ignored by the Superior Court.

   His only challenge to the jury instructions is an indirect contention, discussed in the context of the sufficiency of the evidence argument, that the Superior Court should have instructed the jury that to hold Dr. Painter liable for failing properly to advise Mrs. Jacobs of the risks of the operation or the available alternatives, the plaintiffs were required to prove that she would have subjectively decided not to undergo surgery if she had been so advised. This is contrary to our holding in *Woolley,* where we adopted the "objective test" and said, "The patient's hindsight testimony as to what he [or she] would have done, though relevant, is not determinative of the issue." *Woolley v. Henderson,* 418 A.2d at 1132 (quoting *Sard v. Hardy,* 281 Md. 432, 450, 379 A.2d 1014, 1025 (1977) (quotations omitted)).

time she apparently had made her decision to undergo surgery, Dr. Painter was the primary physician responsible for the treatment of her collarbone problem. In that role, he had a duty to discuss with her the option of undergoing surgery, and to advise her about the option of doing nothing.

■ We also conclude, upon reviewing the facts in the light most favorable to the plaintiff, that the jury could reasonably have found that Dr. Painter breached his duty to Mrs. Jacobs by failing to discuss with her the merits of undergoing surgery. After January 15, 1980, no one took responsibility for advising Mrs. Jacobs in her decision about the surgery. She ended up being admitted to the hospital by Dr. Painter for the purpose of having surgery without receiving any professional advice from him or Dr. Amalfitano. From the evidence presented, the jury could conclude that it was incumbent upon Dr. Painter, as the primary treating physician, to discuss the merits of the operation with Dr. Amalfitano and, of greater importance, with Mrs. Jacobs. Moreover, the jury could have reasonably concluded that had he fulfilled his professional obligation to Mrs. Jacobs, he would have recommended, at the very least, that she consider doing nothing at all about the collarbone problem because the problem was cosmetic and the proposed surgery was both inappropriate and unnecessary. Prior to her admission to the hospital, Dr. Painter, the person primarily in charge of her treatment, never discussed with her the option of doing nothing.

■ Finally, we conclude that the jury could have reasonably found that Dr. Painter's breach of his duty to Mrs. Jacobs proximately caused her injuries. On the facts presented at trial, the jury was warranted in concluding that a reasonable person under the long-term care of a family doctor would choose not to undergo unnecessary surgery if properly advised, before admission to the hospital, that there was a viable alternative to surgery, the option of doing nothing.

### E. Conclusion

■ Having carefully examined the evidence in the light most favorable to the plaintiffs, we conclude that the jury's verdict is properly supported by the facts.

In sum, there was sufficient evidence to establish that Dr. Painter owed a duty to advise or inform Mrs. Jacobs about the merits of the proposed surgery, the risks involved, or the alternatives available, including the option of doing nothing. There was likewise sufficient evidence for the jury to conclude that Dr. Painter breached his professional duty by failing to so advise Mrs. Jacobs. Finally, the jury could have rationally found, under an objective standard, that the breach of that duty was a proximate cause of Mrs. Jacobs' injuries.

### II.

### The Defendant's Motion to Enforce the Plaintiff's Voluntary Dismissal of their Action Against Him

■ The defendant next argues that the Superior Court erred in denying his motion to enforce a dismissal filed by the plaintiffs. We disagree.

On October 12, 1983, the plaintiffs filed a "Notice of Dismissal Under Rule 41(a)" attempting to voluntarily dismiss Dr. Painter from the case. At that time Dr. Amalfitano was a co-defendant in the case. The plaintiffs subsequently filed a withdrawal of their notice of dismissal on October 14. On November 10, 1983, Dr. Painter moved to enforce the plaintiffs' dismissal. In the same motion he asked for summary judgment contending that because the plaintiffs' dismissal was effective, and suit was not re-instituted within two years of the alleged negligent conduct, their suit against him was barred by the statute of limitations. The Superior Court denied the motion.

The defendant argues that the Superior Court erred in denying his motion to enforce dismissal because a notice of dismissal once filed cannot properly be withdrawn. We conclude, however, that the plaintiffs' notice of dismissal was ineffective to terminate the action against the

defendant and the act of withdrawal was superfluous.

Rule 41(a)(1) of the Maine Rules of Civil Procedure provides in pertinent part:

[A]n action may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before commencement of trial of the action.... A dismissal under this paragraph may be as to one or more, but fewer than all claims, *but not as to fewer than all of the plaintiffs or defendants.* (Emphasis added.)

Under the clear provisions of Rule 41(a)(1), the plaintiffs' attempted dismissal of Dr. Painter, without the inclusion of all other defendants in the action, was ineffective. *Cf. State v. Northern Products, Inc.,* 440 A.2d 1070, 1072 (Me.1982) (voluntary dismissal ineffective to dismiss action as to fewer than all plaintiffs). Dr. Painter cannot enforce the plaintiffs' ineffective notice of dismissal, nor can he rely on an ineffective dismissal to argue that the statute of limitations barred the plaintiffs' action against him. Thus, the Superior Court correctly denied his motion.

### III.

### The Defendant's Proposed Jury Instructions on the Apportionment of Damages between Dr. Painter and Dr. Amalfitano

The defendant asserts that the Superior Court erred by not instructing the jury, under his proposed special interrogatories, to apportion the damages recoverable by Mrs. Jacobs between himself and Dr. Amalfitano. This argument is totally without merit.

The allocation the defendant seeks is available only in cases "involving multi-party defendants." 14 M.R.S.A. § 156 (1980). Thus, in order to make his argument tenable, he attempts to challenge the validity of a stipulated dismissal of Dr. Amalfitano that was approved by the Superior Court over one and one-half years before trial. By the time this case proceeded to the

pretrial conference, Dr. Painter had never objected to the court's order dismissing Dr. Amalfitano from the action. In fact, his objection to Dr. Amalfitano's dismissal was raised for the first time after trial at a hearing on his motion for judgment notwithstanding the verdict.

■ The pretrial order of the Superior Court established that the only defendant in this action was Dr. Painter. By failing to object either to the dismissal of Dr. Amalfitano before the issuance of that pretrial order or to the pretrial order, itself, the defendant failed to preserve his right to object to that dismissal after trial or on appeal. *See Ocean National Bank of Kennebunk v. Odell,* 444 A.2d 422, 424 (Me.1982). Since the case did not involve multiple defendants, Dr. Painter was not entitled to have the jury apportion the responsibility for damages between himself and Dr. Amalfitano.[3]

The entry is:

Judgment affirmed.

McKUSICK, C.J., and ROBERTS and GLASSMAN, JJ., concur.

CLIFFORD, Justice, with whom NICHOLS and WATHEN, JJ., join, dissenting.

I concur with Parts II and III of the court's opinion, but I respectfully dissent from Part I. Nothing in the record supports a conclusion that Dr. Painter as a general practitioner was in any way on notice that surgery was contraindicated or that the use of pins posed a significant risk. Moreover, the record clearly shows that Mrs. Jacobs had actual knowledge that conservative treatment was a viable alternative when she consented to surgery. Consequently, Dr. Painter's failure to disclose this fact did not proximately cause her injury.

### I.

The theory upon which this case was tried, and upon which the court upholds the jury verdict, was that Dr. Painter, as Mrs.

---

3. In any event, the Superior Court properly set off the jury verdict by amounts the plaintiffs previously received from their settlement with Dr. Amalfitano.

Jacobs' family physician, did not disclose information that he had a duty to disclose and that was necessary to Mrs. Jacobs' making an intelligent decision regarding treatment, and that his failure to disclose that information proximately caused Mrs. Jacobs' harm. In particular, Dr. Painter did not disclose to Mrs. Jacobs that conservative treatment was a viable alternative to surgery. *See generally* Prosser & Keeton, *Torts* § 32 at 189–93 (5th ed. 1984).

### A.

In my judgment, the court errs by grounding its analysis of the existence of Dr. Painter's duty to disclose on the referral-consultation distinction.[1] Neither Mrs. Jacobs' expert medical witness, Dr. Garger, nor Dr. Painter's expert medical witness, Dr. Barrett, testified that Dr. Painter's duty to disclose turned on whether the relationship between Dr. Painter and Dr. Amalfitano was properly characterized as a

referral or a consultation. To the contrary, both expert medical witnesses testified that the existence of Dr. Painter's duty to disclose depended on whether he remained involved to some degree in treating Mrs. Jacobs' injury. Therefore, Dr. Painter's duty to disclose arose, as it always has, from the fiduciary character of the physician-patient relationship. *See Woolley v. Henderson* 418 A.2d 1123, 1128 n. 3 (Me. 1980).

### B.

Despite the court's suggestion to the contrary, malpractice liability premised on breach of a duty to disclose no longer rests entirely on Maine common law. The principles governing the duty of a physician to disclose are set out in *Downer v. Veilleux*, 322 A.2d 82, 89–93 (Me.1974), and section 2905 of the Maine Health Security Act, 24 M.R.S.A. §§ 2501–2961 (Supp.1986).[2] As a

1. The referral-consultation distinction mainly concerns the allocation of responsibilities for the actual management of treatment between physicians. Referral denotes the transfer of responsibility for care of specific problems to another physician. Consultation, on the other hand, is essentially a request for the opinion of a colleague. A referring physician cannot be held vicariously liable for the negligent performance of services by the physician to whom the patient was referred. *See Graddy v. New York Medical College,* 19 A.D.2d 426, 429–30, 243 N.Y.S.2d 940, 944 (1963), *motion to dismiss app. denied* 13 N.Y.2d 1175, 248 N.Y.S.2d 54, 197 N.E.2d 541 (1964). This is true even if the referring physician concurrently cares for the patient. *See, e.g., Dahlberg v. Ogle,* 268 Ind. 30, 35–37, 373 N.E.2d 159, 162–63 (1978); *Evans v. Bernhard,* 23 Ariz.App. 413, 416–17, 533 P.2d 721, 724–25 (1975); *Smith v. Beard,* 56 Wyo. 375, 110 P.2d 260, 281 (1941). Here, the cause of action is based not on negligent performance of services but on breach of a duty to disclose. Since physicians who are concurrently treating a patient may have parallel duties to disclose running to the patient, independent of the degree of control each might have over the chosen means of treatment, whether the relationship between the physicians is properly characterized as a referral or consultation is irrelevant.

2. In *Downer v. Veilleux,* 322 A.2d 82, 89–93 (Me.1974), this court rejected technical battery as a theory of recovery when a physician has failed to make adequate disclosures for the majority view that failure to inform a patient of the risks involved in proposed treatment is more

properly characterized as a species of medical malpractice sounding in negligence. Nevertheless, this court in *Downer* expressly left unresolved the scope of the physician's duty to disclose and the test applicable in determining proximate causation. *Id.* at 92.

In 1977, three years after *Downer* was decided and before this court had further developed the case law concerning informed consent, the legislature enacted the Maine Health Security Act, P.L.1977, ch. 492, which implemented legislation recommended by the Pomeroy Commission which had been created to undertake a thorough and comprehensive review of medical and hospital malpractice in Maine and to make concrete proposals for legislation whose effect would be to assure, in the face of a growing crisis generated by the proliferation of medical malpractice claims, the availability of malpractice liability insurance at reasonable cost to physicians and hospitals alike. *See* P. & S.L.1975, ch. 73. In its Findings and Recommendations submitted to the 108th Legislature the Pomeroy Commission proposed the present section 2905 and specifically noted that

[t]he decisional law of Maine has not fully developed the tests and standards for a physician's duty to inform a patient concerning the nature and possible consequences of proposed treatment or procedures. In the current malpractice climate the confusion and disagreement on this matter in other states has left Maine hospitals and physicians in doubt as to what is required. For this reason the Commission believes statutory clarification is desireable [sic]. *It recommends a duty to inform based upon the standards of medical*

general practitioner Dr. Painter's duty to disclose is measured by "the standards of practice among members of the same health care profession *with similar training and experience situated in the same or similar communities ...*" 24 M.R.S.A. § 2905(1)(A) (emphasis added).[3] Moreover, the disclosure must be made in such a manner that "[a] reasonable person [*cf. Downer*, 322 A.2d at 90 ("patient of ordinary understanding")], from the information provided by the physician under the circumstances, would have a general understanding of the procedures or treatments and of the usual and most frequent risks and hazards inherent in the proposed procedures or treatment ..." 24 M.R.S.A. § 2905(1)(B).[4] Naturally, a general understanding of the "risks and hazards inherent in the proposed procedures or treatment" entails knowledge of the alternatives, including conservative treatment, without which it is impossible for the patient to evaluate the relative merits of any specific procedure or treatment. *Downer*, 322 A.2d at 90–91. Nevertheless, "where the physician does not know of a risk and should not have been aware of it in the exercise of ordinary care, he is under no obligation to make disclosure" and thus the failure to disclose is not negligent. *Sard v. Hardy*, 281 Md. 432, 445, 379 A.2d 1014, 1022–23 (1977) (citations omitted).

## II. A.

A review of the record leads me to conclude that Mrs. Jacobs, who had the burden of proof throughout, utterly failed to show that in 1980 a general practitioner practicing in Winthrop or a similar community reasonably should have known either that surgery was contraindicated or that use of pins posed a significant risk. The uncontradicted evidence was that the authoritative treatises, Campbell's *Operative Orthopaedics* and Rockwood and Green's *Fractures*, the only two treatises on the subject produced at trial, contained *nothing* that would have put a general practitioner, confronted with what both expert medical witnesses acknowledged was an unusual injury, on notice that surgical repair or the use of pins specifically was contraindicated. *Cf. Harbeson v. Parke Davis, Inc.*, 746 F.2d 517, 525 (9th Cir. 1984). Dr. Garger, who asserted to the contrary, referred to no valid source to support the assertion. The evidence, in fact, compels a contrary conclusion.

The information available to Dr. Painter may be summarized as follows. In dislocation of the sternoclavicular joint the medial end of the clavicle becomes dislocated either anteriorly or posteriorly, more frequently anteriorly, with the medial end of the clavicle displaced inferiorly so that it

---

*practice in the community, and an objective test (reasonable person) of the patient's consent to treatment ....*

Report to the One Hundred and Eighth Legislature (1977) at xxiii (emphasis added). Then, in 1980, this court decided *Woolley v. Henderson*, 418 A.2d 1123, which likewise supplied the standards omitted in *Downer*, but which concerned a cause of action that arose *before* the enactment of section 2905. Consequently, this court expressly noted in *Woolley*, 418 A.2d at 1130 n. 5, there was no occasion to construe the statute. Since Mrs. Jacobs' injury occurred in 1980, three years *after* the enactment of section 2905, the court, in my judgment, must construe the statute and is bound by its provisions. *See Informed Consent in Maine: Woolley v. Henderson and the Informed Consent Statute*, 34 Me.L.Rev. 311, 321–22 (1982) ("Section 2905(1)(A) establishes the professional standard of disclosure for physicians").

**3.** Basing the duty to disclose upon the standards of medical practice in the community sub-

stantially conforms to preexisting law in Maine as applied to general practitioners like Dr. Painter. This court has consistently upheld the inclusion of the community factor as a proper consideration in establishing the duty of a general practitioner, although "strict locality" has never been the rule in Maine. *See Taylor v. Hill*, 464 A.2d 938, 942–43 n. 1 (Me.1983); *Roberts v. Tardif*, 417 A.2d 444, 451 (Me.1980).

**4.** *Cf. Cobbs v. Grant*, 8 Cal.3d 229, 244, 104 Cal.Rptr. 505, 515, 502 P.2d 1, 11 (1972):

[T]he patient's interest in information does not extend to a lengthy polysyllabic discourse on all possible complications. A mini-course in medical science is not required; the patient is concerned with the risk of death or bodily harm, and problems of recuperation.... [T]here is no physician's duty to discuss the relatively minor risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence.
(Footnote omitted.)

overlaps the first rib. Dislocation usually can be treated conservatively, but without some treatment the medial end of the clavicle may become fixed in position and produce a rather unsightly prominence. For people with sedentary occupations this results in little disability. Old, unreduced dislocations and recurrent dislocations may be surgically treated by either resection, binding the clavicle in place with fascial loops, or pins. Neither Campbell nor Rockwood and Green suggests either that surgery is contraindicated or that use of pins posed a risk of serious bodily injury. Rockwood and Green in fact suggests that if the dislocation causes annoyance it will probably create problems for the patient and that if it can be repaired it should be.

Both Dr. Garger and Dr. Barrett testified that sternoclavicular dislocations were relatively rare, difficult to treat, and best handled by a specialist. Both testified that Dr. Painter's referring Mrs. Jacobs to a specialist was therefore good medical practice. Both testified that in such circumstances the general practitioner should grant considerable deference to the opinions and recommendations of the specialist.

In the follow-up January 22 letter, in which he summarized his opinions and recommendations to Dr. Painter, Dr. Amalfitano specifically identified Mrs. Jacobs as "a large, rugged individual, [who] probably does a lot of heavy lifting, pulling, and tugging" and who had a sternoclavicular separation which was "a long-standing, old injury." He further pointed out that Mrs. Jacobs had "shifting of the clavicle with nonfixation" and that it might be difficult to make the clavicle stay in the joint. Dr. Amalfitano concluded that "[i]f there is confirmed evidence of sternoclavicular separation, surgical repair certainly is indicated, if the patient wants to have it done."

On this record, I would conclude as a matter of law that Dr. Painter, as a general practitioner in Winthrop or a similar community in 1980, could not be expected to know either that surgery was contraindi-

cated or that the use of pins presented a risk of serious bodily harm. *See Kranda v. Houser-Norborg Medical Corp.,* 419 N.E.2d 1024, 1037–38 (Ind.Ct.App.1981), *petition for reh. denied,* 424 N.E.2d 1064 (Ind.Ct.App.1981), *appeal dismissed,* 459 U.S. 802, 103 S.Ct. 23, 74 L.Ed.2d 39 (1982); *Trogun v. Fruchtman,* 58 Wis.2d 569, 603–04, 207 N.W.2d 297, 315 (1973). Consequently, had Dr. Painter made any disclosures, they would have been limited to describing precisely the information supplied by the treatises which, if applied to the criteria Dr. Amalfitano set out in his letter to Dr. Painter, lead to the inescapable conclusion, not only that surgery was appropriate, though not absolutely necessary, but also that the use of pins was a viable alternative. In light of this evidence the assertions of Dr. Garger as to it being commonly known that such surgery was contraindicated and posed a serious risk must be entirely discounted for lack of support in the record. *See Warren v. Waterville Urban Renewal Authority,* 235 A.2d 295, 298 (Me.1967), *cert. denied,* 390 U.S. 1006, 88 S.Ct. 1249, 20 L.Ed.2d 105 (1968); *Brouillette v. Weymouth Shoe Co.,* 157 Me. 143, 145–46, 170 A.2d 412, 413–14 (1961). Since Dr. Painter could not be expected to know of the specific risk that resulted in injury, he was under no obligation to disclose it. *Sard,* 281 Md. at 445, 379 A.2d at 1022–23.

### B.

Assuming, nevertheless, that Dr. Painter as a general practitioner did know or reasonably should have known of the risk that resulted in injury, Mrs. Jacobs has adduced no evidence to show that Dr. Painter's failure to disclose the fact that conservative treatment was an appropriate alternative proximately caused her harm. To establish proximate causation, Mrs. Jacobs had to show that had she, as a reasonable person,[5] been informed of this fact she would not have submitted to surgery. *Downer,* 322 A.2d at 92. Consequently, if Mrs. Jacobs had *actual* knowledge of this fact, Dr.

5. Section 2905(1)(C) precludes recovery if "[a] reasonable person, under all surrounding circumstances, would have undergone such treat-

ment or procedure had he been advised by the physician in accordance with [the appropriate standards of disclosure]."

Painter's failure to make a reasonable disclosure would have no causal relation to her injury.[6] *See, e.g., Vergie M. Lapelosa, Inc. v. Cruze,* 44 Md.App. 202, 210–11, 407 A.2d 786, 791–92 (1979), *cert. denied,* 287 Md. 754 (1980); *Fleishman v. Richardson-Merrell, Inc.,* 94 N.J.Super. 90, 93–95, 226 A.2d 843, 845–46 (App.Div.1967).

The record reveals that Dr. Amalfitano discussed with Mrs. Jacobs on at least *three* occasions the material risks of the proposed surgery as well as the alternatives, including conservative treatment. Dr. Amalfitano testified that he discussed with her the alternatives and possibilities of treatment, including conservative treatment, on January 15 at her office visit after leaving Dr. Painter. Again on January 27, the day Mrs. Jacobs was admitted to the hospital, Dr. Amalfitano examined her and discussed her options. Finally on January 29, the eve of the operation, Dr. Amalfitano, as was required by hospital rules, discussed with Mrs. Jacobs the material risks of the proposed surgery and alternative treatment before obtaining Mrs. Jacobs' signature on a written consent.[7] Specifically, Dr. Amalfitano discussed procedure failure, loss of clavicle and loss of life, conservative treatment, resection and pinning. Dr. Amalfitano disclosed to Mrs. Jacobs the fact that the pins sometimes break and do come out but concluded by recommending pinning to Mrs. Jacobs.[8]

The record compels the conclusion that when she consented to surgery on January 29 Mrs. Jacobs had from her discussions with Dr. Amalfitano actual knowledge that conservative treatment was a viable alternative. Moreover, the signed written consent Dr. Amalfitano obtained after disclosure established a presumption that such consent was valid. 24 M.R.S.A. § 2905(2). Therefore, when Mrs. Jacobs consented to surgery she had a "general understanding" of the proposed treatment and the alternatives, including conservative treatment, conforming to the disclosures required of a general practitioner in Winthrop or similar communities, as measured by the standards of the informed consent statute, 24 M.R.S.A. § 2905(1)(A) & (B). At a minimum, having learned from an unimpeachable source that conservative treatment was a viable alternative, Mrs. Jacobs cannot now be heard to say that Dr. Painter's failure to disclose the same fact was the proximate cause of her injury.

Therefore, for the foregoing reasons, I would vacate the judgment of the Superior Court for entry of judgment for the defendant.

**6.** *See Wheeldon v. Madison,* 374 N.W.2d 367, 375 (S.D.1985); *Crain v. Allison,* 443 A.2d 558, 562 (D.C.App.1982); *Sard v. Hardy,* 281 Md. 432, 444–45, 379 A.2d 1014, 1022 (1977); *Wilkinson v. Vesey,* 110 R.I. 606, 627–28, 295 A.2d 676, 689 (1972); *Canterbury v. Spence,* 464 F.2d 772, 790 (D.C.Cir.1972), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); *Natanson v. Kline,* 186 Kan. 393, 409–10, 350 P.2d 1093, 1106 (1960), *motion for reh. denied,* 187 Kan. 186, 354 P.2d 670 (1960).

**7.** The trial court refused to give Dr. Painter's requested verbatim section 2905(1) instruction, but did substantially include the provisions of section 2905(1) in its instruction relating to the duties to disclose and proximate causation. However, the trial court refused to instruct the jury on 24 M.R.S.A. § 2905(2) which accords a mandatory rebuttable presumption to a signed written consent:

A consent which is evidenced in writing and which meets the foregoing standards, and which is signed by the patient or other authorized person, shall be presumed to be a valid consent. This presumption, however, may be subject to rebuttal only upon proof that such consent was obtained through fraud, deception or misrepresentation of material fact.

As justification for refusal, the trial court stated that Dr. Amalfitano's disclosures leading to the written consent were too cursory and inadequate even though Mrs. Jacobs introduced no evidence tending to show fraud, deception or misrepresentation. However, Dr. Painter did not press the point on appeal.

**8.** Dr. Amalfitano further testified that he had treated approximately twelve sternoclavicular separations in his career and had treated six of them conservatively. At least three times Dr. Amalfitano had had problems with pins migrating. Nevertheless, Mrs. Jacobs produced no evidence suggesting that this fact was known to Dr. Painter nor did she show what the likelihood was that this would happen.